## No. 11,839.

## Morley *v.* Post Printing and Publishing Company, et al.

Decided May 21, 1928.   Rehearing denied June 11, 1928.

Mr. C. A. IRWIN, Mr. HARRY G. SAUNDERS, for plaintiff in error.

Mr. JOHN T. BOTTOM, for defendants in error.

*En Banc.*

MR. JUSTICE BUTLER delivered the opinion of the court.

THE plaintiff in error sued the defendants in error on three causes of action for libel. The defendants filed two demurrers to each cause of action; one for insufficient facts, the other for misjoinder of parties defendant. The demurrers were sustained, the plaintiff elected to stand upon his complaint, and the case was dismissed. At the time of the publication of the alleged libels, the plaintiff

was governor of Colorado, invested by the State Constitution (article 4, § 7) with the exclusive power to grant reprieves, commutations and pardons after conviction.

I. The article of which the plaintiff complains in his first cause of action was published in the Denver Post on January 5, 1927. The article is too long to be quoted at length. The following extracts are pertinent:

> "Traffic in Pardons Has Almost Emptied
> Canon City Prison.
>
> "19 Murderers and 22 'Lifers' Freed.
>
> "In Two Years Morley Has Released 234 Criminals, Two of Whom Were Rapists; $30,000 Fund Reported Used by Convicts Who Want to Get Out Before Governor's Term Ends.
>
> "Suspension of Warden Tynan of the state penitentiary by Governor Morley, Tuesday, brought in its wake the most shocking pardon scandal in the state's history, a scandal that will rock the state from end to end and undoubtedly will result in an investigation of Morley's activities with respect to pardons and paroles, either by the twenty-sixth general assembly or a grand jury.
>
> "As his answer to Morley's attempt to oust him from office and turn the management of the big state prison over to the Ku Klux Klan, Tynan, Wednesday morning, made public the list of pardons and paroles issued by Morley since he became the state's executive in January, 1925.
>
> "The list surpasses anything in the state's history. Twenty-three life termers, nineteen murderers, several rapists and two highwaymen were turned loose upon society by the governor during the two years he was in office. Included in the list of murderers are three men who were sentenced to hang by the juries who tried them, but whose sentences were commuted to life imprisonment by two of Morley's predecessors.
> \* \* \*

"It was Tynan's refusal to abstain from publication of Morley's pardon record, the warden asserts, that prompted the governor to prepare charges against the warden and seek to oust him before the end of his term. And reports current for weeks at the capitol have it that if the governor succeeds in getting Tynan out between now and next Tuesday, scores of additional pardons and paroles will be issued.

"An investigation by either the legislature or a grand jury here or in Canon City must be had. For months rumors have been afloat that money, and lots of it, has been responsible for the release of prisoners from the penitentiary. The members of the state's law-making body owe it to themselves and the people of the state to go to the very bottom of the scandals and find out if money was actually used to get these prisoners out of the penitentiary, and if money was used, to whom it was paid for such powerful influence—sufficient to induce the governor to thus empty the penitentiary of its worst criminals.

"Five Intimates May Hold Secret of Power Behind
Morley Pardons.

\*   \*   \*

"Dr. A. E. Max, convicted in Denver of second-degree murder in connection with the death of a Denver girl thru illegal operation, is to be the next beneficiary of Gov. Clarence J. Morley's parole system, according to dispatches Wednesday from Canon City, where the prison is located. A $30,000 slush fund is working in Max's behalf, it is declared, and his friends are boasting that the parole is assured. The money, it is said, is being scattered right and left.

\*   \*   \*

"Never before has the governor of Colorado had the hardihood to turn loose so many dangerous criminals upon society as Morley has, according to this list. Mur-

derers, rapists, highwaymen, burglars and thieves abound in the list, the murderers serving life sentences seem to have been the governor's favorites. Rapists also figure prominently in the list, there being several whom the governor liberated, and who knows when they may commit more assaults upon decent women?

### "Governor Made Specialty of Freeing Bootleggers and Still Operators.

"Another class of convicts prominent in the list is that of violators of the state prohibition law. Being a professed prohibitionist of the most ardent type, Morley made a specialty of turning loose bootleggers and manufacturers of bootleg whisky convicted of operating stills. Bootleggers and moonshiners are notorious for the use of money.

\* \* \*

"When he took office, Morley announced that he never would extend executive clemency to three classes of prisoners: Murderers, rapists and violators of the prohibition law. The list shows that he preferred these classes of violators to all others, tho he seems to have a warm spot in his heart for the ordinary highwayman and burglar.

\* \* \*

"Morley, it is disclosed thru his executive orders, started his orgy of pardons and paroles soon after he assumed his office and kept it up practically during his entire term.

\* \* \*

"The whole scandal will probably be aired in the general assembly before the end of another week. Morley must make a report of his pardons and paroles to the general assembly. This report will most likely cause some senators and representatives to demand an investigation. Legislators and others are speculating whether

the report Morley makes, now that Tynan has made the list public, would have been the same had Morley succeeded in obtaining possession of the prison office and its records.''

The omitted parts refer to the list of prisoners said to have received executive clemency; state the names of the ''five intimates'' above referred to; refer to specific cases of executive clemency; urge an investigation by a legislative committee or by a grand jury; and refer to a movement to amend the Constitution so as to limit the pardoning power of the governor.

The complaint alleges that the article was published by the defendants maliciously and with intent to impeach the honesty, integrity, virtue and reputation of the plaintiff and expose him to public hatred, contempt and ridicule; that the publication was false, and was known by the defendants to be false when published; and was intended by the defendants to, and did, cause it to be believed, that the plaintiff had been guilty of corruption in office as governor of the state of Colorado and had been the recipient of bribes. It further alleges that the plaintiff has not been guilty of corruption in office as governor of the state of Colorado and has not been the recipient of bribes; that by reason of the wrongs complained of the plaintiff has been damaged in a specified sum; that the plaintiff is and for many years has been a member of the bar of Colorado and a practicing lawyer before all the courts of said state, and intends to continue such practice in the City and County of Denver and state of Colorado; that the defendants, well knowing this, intended by said publication to injure him in his calling and profession; that he has been and will be damaged in his calling and profession in a specified sum as special damages; and that the injury complained of was attended by circumstances of fraud, malice and insult to the plaintiff, and by a reckless disregard of the plaintiff's rights and feelings.

By their general demurrer, the defendants take the position that, assuming the truth of the plaintiff's allegations, the plaintiff is not entitled to any relief.

1. The plaintiff contends that the article published impeaches the honesty, integrity, virtue and reputation of the plaintiff. The defendants deny this. To constitute libel, it is not necessary that a publication shall impute to a person the commission of a crime; it is sufficient if it tends to impeach his honesty, integrity, virtue or reputation. In *Republican Pub. Co. v. Mosman,* 15 Colo. 399, 24 Pac. 1051, we held that any false and malicious writing published of another is libelous per se when its tendency is to render him contemptible or ridiculous in public estimation, or to expose him to public hatred or contempt, or to hinder virtuous men from associating with him. It is not necessary that the publication shall produce those results; it is sufficient if it has a tendency to produce any one of them. A newspaper publication must be measured by its natural and probable effect upon the mind of the average lay reader. *Dusabek v. Martz,* 121 Okl. 241, 249 Pac. 145, 49 A. L. R. 253. ''In determining whether words are libelous, they are to be given their ordinary and popular meaning; and if they are susceptible of two meanings, one libelous and the other innocent, the former is not to be adopted and the latter rejected as a matter of course, but it must be left to the jury to determine in what sense they were used.'' *Black v. State Co.,* 93 S. C. 467, 77 S. E. 51, Ann. Cas. 1914 C, 989. ''It is generally held to be the function of the court to determine, as a question of law, whether a published statement is libelous per se, and if the words are unambiguous and admit of but one sense, the question whether they are defamatory is one which the court must decide, and instruct the jury accordingly. On the other hand, where the words used are ambiguous in their import, or may permit, in their construction, connection, or application, a doubtful or more than one interpretation, and in some sense be defamatory, the question whether they are

such is for the jury under proper instructions from the court." 17 R. C. L., pp. 425, 426. And see *Downing v. Brown,* 3 Colo. 571. It is not necessary that the publication shall cause all persons, or even all the readers of the newspaper, to regard the plaintiff with hatred or contempt, etc.; it is sufficient to constitute libel if it does so affect, or if it is calculated to affect, a substantial number of persons. In *Peck v. Tribune Co.,* 214 U. S. 185, 29 Sup. Ct. 554, the Supreme Court of the United States held that it is sufficient if it "will be known by a large number and will lead an appreciable fraction of that number to regard the plaintiff with contempt." The fact that an article does not in positive terms charge a person with receiving bribes, is not sufficient, as a matter of law, to save the article from being libelous; insinuation may be as injurious as a positive charge. *Switzer v. Anthony,* 71 Colo. 291, 295, 206 Pac. 391; *Republican Pub. Co. v. Miner,* 3 Colo. App. 568, 34 Pac. 485; *Dusabek v. Martz,* 121 Okl. 241, 249 Pac. 145, 49 A. L. R. 253. Nor does the fact that an article purports to publish a rumor relieve the article of its libelous character. *Republican Pub. Co. v. Mosman,* 15 Colo. 399, 413, 24 Pac. 1051; *Meeker v. Post Printing and Pub. Co.,* 55 Colo. 355, 135 Pac. 457; *Switzer v. Anthony,* 71 Colo. 291, 295, 206 Pac. 391; *Republican Pub. Co. v. Miner,* 3 Colo. App. 568, 576, 34 Pac. 485.

2. Defendants' counsel says that this is a qualifiedly privileged communication. Qualified privilege is an affirmative defense, to be pleaded by the defendants. Where, however, it appears from the allegations of the complaint that the publication sued upon is privileged, a demurrer is the proper method of raising the point. Assuming, but not deciding, that the complaint in this case shows a qualified privilege, it is the law that the condition that makes such a communication privileged is that it be not made maliciously. In such case, the law, it is true, does not imply malice from the publication itself, but casts upon the plaintiff the burden of alleging

and proving actual malice; but if he does this, the defense of privilege is destroyed. *La Plant v. Hyman,* 66 Colo. 128, 180 Pac. 83; *Denver Public Warehouse Co. v. Holloway,* 34 Colo. 432, 83 Pac. 131; *Hoover v. Jordan,* 27 Colo. App. 515, 150 Pac. 333; *White v. Nicholls,* 3 How. (U. S.) 266, 11 L. Ed. 591. Counsel contends that actual malice is not alleged in the complaint; and that, as the complaint shows that the publication is privileged, and contains no allegation of actual malice, which is necessary to destroy the privilege, the complaint is insufficient, and, therefore, that the general demurrer thereto was properly sustained. But the plaintiff alleges that the defendants published the article maliciously, and with intent to impeach the honesty, integrity, virtue and reputation of the plaintiff, and expose him to public hatred, contempt and ridicule; that the publication was false, and was known to the defendants to be false; that the injury complained of was attended by circumstances of fraud, malice and insult to the plaintiff, and by a reckless disregard of the plaintiff's rights and feelings. This certainly alleges malice sufficiently to defeat a general demurrer.

Applying the foregoing principles to the present case, we have no doubt of the sufficiency of the allegations in the first cause of action. The court erred in sustaining the general demurrer thereto.

II. On January 6, 1927, the day after the publication of the article just discussed, the defendants published another article, of which complaint is made in the second cause of action. We copy from the complaint:

"Morley Paroles Four Criminals Thursday.

"Governor Secretly Orders Release of Convicts in Spite of Wave of Indignation Caused By His Pardon Orgy.

"In the face of the public clamor which followed revelations in The Post Wednesday of his orgy of wholesale pardons and paroles granted convicts in the state peni-

tentiary Governor Morley Thursday dashed off four more paroles, seemingly determined to empty the state prison before his term ends next week.

\* \* \*

" 'My office will investigate and, in fact, has already started investigating the use of big slush funds to bring about the liberation of prisoners sentenced to the state penitentiary,' District Attorney Cline said. 'All that is needed is a little more time and more concrete evidence to warrant the assembling of a grand jury and a demand that every one involved be brought to trial.'

"Every pardon and parole given during Morley's term in office will be carefully investigated, District Attorney Cline said. And in each case, if sufficient evidence connected with the 'big money trail' is uncovered, the suspected trail blazer will be brought to trial, he said.

"Every indication of the use of money in freeing a prisoner has already been brought to the attention of the district attorney, he stated. That is the case, Cline said, of Jacob Karsh, sentenced on Sept. 16, 1926, to a long term in the penitentiary after admission that he had systematically stolen about $7,000 or $8,000 from the Hoover Drug company. Karsh admitted on the stand according to Cline, that his thefts covered a period of five or six years.

" 'Bribe money was much in evidence during the trial,' District Attorney Cline stated, 'and I am sure that someone was paid to exert illegal efforts for a parole before the man will be released, on Jan. 27, 1927.'

"At the time the prisoner was released Governor Morley said he thought the term given him was too stiff for such an offense.

"State Aroused by Expose.

"Indignation over the use by Governor Morley of his pardoning power swept the entire state Thursday. From all quarters protests were heard.

"If the twenty-sixth general assembly launches an investigation, it is certain to be started by the Republican faction—and the Republican party elected Morley to office.

"When the governor made a final desperate effort before leaving office to 'get' Warden Tynan, to oust him from office and turn the management of the big penitentiary over to the Ku Klux Klan, which is strong in Canon City, the governor 'started something.' He brought about the release by the warden of the long list of prisoners who have been pardoned or paroled by Governor Morley since January, 1925.

"But Morley had hoped, in the suspension of Tynan, to keep the scandal a secret. He knew the warden was planning to make the shocking list of pardons and paroles public, and he felt it his duty to reveal the affair to the citizens of the state. And the governor, accordingly, attempted unsuccessfully to throttle the warden by suspending him."

As part of the publication there is a cartoon. It represents a man, labeled "Gov. Morley" turning the crank of a machine. Issuing from the machine are many slips of paper; one marked "Pardon for Murderer," another, "Pardon for Lifer," another, "Pardon for Rapist," and others, "Pardon." Underneath are printed the words "A Well 'Greased' Machine."

This cause of action contains averments of intent, purpose, motive, and damage similar to those in the first cause of action. The general demurrer to this cause of action should have been overruled.

III. On January 7, 1927, the day after the second article was published, the defendants published a third article. It follows:

"Morley Frees Burglar In New Prison Orgy.

"Prison-Breaker Who Stole Christmas Gifts from Fellow Convicts and Sold Them on Streets is the Latest to Get Parole.

"In spite of the state-wide storm of protest which has arisen since the disclosures in The Post of Governor Morley's orgy of wholesale pardons and paroles, the pardon-mad governor, Friday, continued his campaign to empty the penitentiary before his term expires by granting a parole to a burglar known as one of the worst convicts in the penitentiary."

As part of the publication there is a cartoon. A man labeled "Grand Jury" is examining a picture held before him by a man labeled "Colorado," who is saying, "It's Worth Looking Into." The picture is marked "Gov. Morley's Pardon Orgy." To the left, in the picture, is a building marked "State House"; to the right, a building marked "Penitentiary." Foot prints are represented leading to the north door of the capitol building. From the door on the west side of the capitol building —the door nearest the governor's office—are foot prints leading directly to the penitentiary; and many foot prints are represented coming from the penitentiary gate and gradually fading away in the distance. Underneath are the words "The Golden Trail."

This cause of action contains averments of intent, purpose, motive and damage similar to those in the first cause of action. It was error for the trial court to sustain the general demurrer to the third cause of action.

IV. The three dissenting justices believe that the articles and cartoons are not susceptible of a libelous interpretation as charging bribery or official corruption. On the other hand, the majority believe that the publications should be submitted to the jury, under the rule, already referred to, that where words—the same rule applies to cartoons—are ambiguous in their import, or may permit, in their construction, connection, or application, a doubtful or more than one interpretation, and in some sense be defamatory, the question whether they are such is for the jury under proper instructions.

As the case may be tried to a jury, and we do not wish to prejudice the rights of either side at the trial, we

refrain from an extended discussion of the nature of the articles and cartoons. If the case were before us after a trial of the issues, we would exercise greater freedom in discussing the matter.

V. The special demurrer to each cause of action for misjoinder of parties defendant should have been overruled. In each cause of action, it is alleged that the defendants—not one defendant, but both—did the things complained of. In passing upon a demurrer to a complaint, courts are bound by the allegations in the pleading; they are not permitted to speculate on what the evidence may disclose upon the trial.

The judgment is reversed, and the cause is remanded with directions to the lower court to overrule the demurrers, and for further proceedings not inconsistent with the views herein expressed.

Mr. Justice Burke, Mr. Justice Whitford and Mr. Justice Campbell dissent.