No. 13,006.

Bereman *v.* Power Publishing Company et al.

(27 P. [2d] 749)

Decided December 4, 1933.

Mr. John T. Bottom, for plaintiff in error.

Mr. Floyd F. Miles, for defendants in error.

*En Banc.*

Mr. Justice Butler delivered the opinion of the court.

E. W. Bereman sued the Power Publishing Company, a corporation, Earl Hoage, C. A. Magnuson, Casey's Superior Laundry Company, a corporation, and Sam J. Kortz for damages for an alleged libel. The court nonsuited him and rendered judgment dismissing the action. He seeks a reversal of that judgment.

The alleged libel was published in the Colorado Labor Advocate, the official publication of the Colorado State Federation of Labor and other labor organizations. It

is published by the Power Publishing Company, of which Hoage is president. The plaintiff was employed by the Casey company as a laundry driver and solicitor, and was a member of the Laundry Drivers' Union. Casey's laundry is regarded by organized labor as the only union laundry in Denver, and a large part of its customers are members of labor unions. Sam Kortz is president and manager of the Casey company. It operates under an agreement with the Laundry Drivers' Union. On a Saturday the plaintiff quit the employ of the Casey company and entered the employ of the Columbine Laundry Company, which, though employing some members of labor unions, has refused to become "unionized" and is regarded by union members as hostile to labor unions. On Monday of the following week the plaintiff called upon the customers he had called upon when working for the Casey company, and obtained their laundry without informing them that he then was working for a nonunion laundry. He testified that he informed most of them, but not all, that he was taking orders for the Columbine laundry. He wore his union pin at the time. He did not say that he told any of them that that laundry was nonunion. Magnuson, the editor of the Labor Advocate, heard of the situation, and upon investigating was informed that the plaintiff did not tell any of the customers that he had left Casey's and was collecting for the Columbine. Believing that to be true, and having been informed by the secretary of the union that the plaintiff's expulsion was certain, Magnuson wrote and published in the Labor Advocate the article upon which this action was based.

Referring to the plaintiff and two other drivers simillarly situated, the article says:

"Three Laundry Drivers Desert Union to Work for Association Head. Anti-Union Employer Buys Off Employes of Casey's Laundry—Union People are Deceived.

"Members of Organized Labor and their friends, do you know where you are sending your laundry?

"Perhaps you have the best intentions to send it to Casey's Laundry—the only union laundry in Denver and the only one deserving your patronage—but are you certain that that is where it is going? Be on your guard!

"During the past week three of the most despicable characters known to organized labor—and any other fair minded persons—call them what you will, the worst is none too bad, have sold out their fellow workers, and the union to which they made obligation and have returned to work for the antiunion Laundrymen's Association.

"These three labor spies have sold their manhood, if they ever possessed any, for a paltry few dollars and have gone to work for the president of the Laundrymen's Association, John Mauro, also owner of the Columbine laundry. The man who is most interested in smashing the Laundry Drivers Union has bought and paid for the souls of three members of the union. The union will not suffer. It is fortunate in having lost such traitorous members.

"But the unfortunate part of the affair is that these men, remember the names, R. L. Jackson, Lee Mellon and E. W. Bereman, have been soliciting laundry from their former customers who are in the majority union people and are taking it to a nonunion laundry without their knowledge. All were formerly employed by the Casey laundry. This laundry is the only one having an agreement with the Laundry Drivers Union and the Laundry Workers Union. This is the only laundry paying a fair wage and providing decent working conditions

"No member of organized labor should let these facts be forgotten for even one week. Challenge your laundry driver as to his identity and watch the laundry bill to see where your laundry has been.

"The Laundry Drivers Union has ordered the three traitors to report at the regular meeting Friday night. Their expulsion is certain."

■ 1. The trial court held that the publication was qualifiedly privileged. We are in accord with that holding. The article complained of appeared in the official publication of the labor organizations. The Labor Advocate is published weekly in the interests of organized labor, to keep union members informed concerning matters affecting their interests. The publishers of the article and those to whom it was addressed had a common interest in the matters to which it related. The article, therefore, was qualifiedly privileged. *Melcher v. Beeler,* 48 Colo. 233, 110 Pac. 181; *Denver Public Warehouse Co. v. Holloway,* 34 Colo. 432, 83 Pac. 131.

The law on this branch of the case is settled in this state. In *Melcher v. Beeler, supra,* we said at page 241: "* * * a communication made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contains incriminatory matter, which, without this privilege, would be slanderous and actionable; and this, though the duty be not a legal one, but only a moral or social duty of imperfect application [obligation]."

■■ 2. The communication being qualifiedly privileged, no right of action arose unless the publishers were actuated by express malice, and the burden of proving express malice was on the plaintiff. The presumption is that the communication was made in good faith and without malice. *Melcher v. Beeler, supra; Denver Public Warehouse Co. v. Holloway, supra; Morley v. Post Printing & Publishing Co.,* 84 Colo. 41, 268 Pac. 540; *Walker v. Hunter,* 86 Colo. 483, 283 Pac. 48; *Hoover v. Jordan,* 27 Colo. App. 515, 150 Pac. 333; *Hemmens v. Nelson,* 138 N. Y. 517, 34 N. E. 342. Assuming that the statements in the article were false, such falsity, of itself, is not sufficient to raise the inference that they were maliciously inspired. *Melcher v. Beeler, supra.* There was no evidence of express malice, nor was there evidence of facts

from which express malice might be inferred. *Gattis v. Kilgo,* 128 N. C. 402, 38 S. E. 931.

3. Where the occasion is privileged, the publication must not go beyond the reasonable requirements of the occasion. If a defendant deliberately adopts a method of communication that gives unnecessary publicity to defamatory statements, he cannot successfully invoke the defense of qualified privilege. Whether there has been excessive publication depends upon the circumstances.

In considering the extent of the publication in the present case, we must bear in mind the nature of the Colorado Labor Advocate and of the communication published therein.

The very life of labor unions depends upon the loyalty of their members. Unions have the power and the right to expel disloyal members, and before the trial that power and right were exercised in this very case. Nothing could be of greater practical interest to labor union members than information concerning acts of disloyalty. It is necessary that they be informed thereof in some manner in order that they may protect themselves against conduct injurious to the cause of organized labor and that, if not exposed, might tend to disrupt a union. Due to the number of labor unions and the large number of their members, it is impracticable to send sealed communications to all. Obviously, it was necessary to adopt some other method of communicating information of interest to organized labor. The Labor Advocate was established to furnish that information. It is not a newspaper of general circulation, its circulation being confined almost exclusively to members of labor unions.

That communications published in papers devoted to particular organizations are not to be treated the same as communications in newspapers of general circulation, is attested by the authorities. Thus, in *Redgate v. Roush,* 61 Kan. 480, 59 Pac. 1050, it was held, quoting

from the syllabus: "Where the officers of a church, upon inquiry, find that their pastor is unworthy and unfit for his office, and thereupon, in the performance of what they honestly believe to be their duty toward other members and churches of the same denomination, publish, in good faith, in the church papers the result of their inquiry, and there is a reasonable occasion for such publication, it will be deemed to be privileged, and protected under the law. * * * Where the publication appears to have been made in good faith and for the members of the denomination alone, the fact that it incidentally may have been brought to the attention of others than members of the church will not take away its privileged character. * * * In such case, and where the plaintiff seeks damages, it devolves on him to establish actual malice." In *Shurtleff v. Stevens*, 51 Vt. 501, an association of Congregational ministers passed a resolution reciting that charges of untruthfulness, deception, and creating disturbance among the churches had been made against a member of the association, and withdrawing fellowship from him pending the hearing of the charges. The resolution was published in two denominational papers circulated among Congregationalists, one throughout New England, the other in Vermont. It was held that such publication was qualifiedly privileged, and, therefore, that in order to recover the plaintiff must prove malice. And in *Barrows v. Bell*. 7 Gray (73 Mass.) 301, a member of a medical society was expelled for dishonorable conduct, for making and vending quack medicines, etc. The publication in the Boston Medical and Surgical Journal of the expulsion resolution, in which the reasons for expulsion were stated, was held to be qualifiedly privileged. In *Kirkpatrick v. Eagle Lodge*, 26 Kan. 384, the court applied the rule announced in *Shurtleff v. Stevens, supra*, to a case where a libelous communication was published in a pamphlet entitled "The Grand Lodge Journal." And see 17 R. C. L. pp. 369, 370.

The publication in the present case did not go beyond

the reasonable requirements of the occasion. The case presents a situation wholly unlike that in *Bearman v. People,* 91 Colo. 486, 16 P. (2d) 425. There, a communication reflecting on a doctor on a hospital staff was directed to the president of the hospital association, but ten thousand printed copies were delivered or mailed to persons having no connection with or interest in the hospital. In that case we cited, as applicable to such a situation, 36 C. J. 1248, which in turn cites *Hoover v. Jordan, supra,* where a communication by the patrons of a public school, charging a teacher with immorality, was directed to a school board. The following example illustrates the dividing line between what is permissible and what is not: Where an inquiry is made as to the responsibility of another, an answer properly communicated is qualifiedly privileged. See *Melcher v. Beeler, supra.* But a publication of the answer in a newspaper of general circulation would be an excessive publication, and would deprive the communication of its qualifiedly privileged character.

 4. A communication may lose its qualifiedly privileged character by the use of language of a defamatory nature not warranted by the occasion that called forth the publication. *Denver Public Warehouse Company v. Holloway, supra.* Some of the words in the article in question are in bad taste, no doubt. Less offensive words might have been selected. But we must not overlook the fact that disloyalty to a union is fraught with such possibilities of disaster to the union cause that loyal union members may be excused for referring to it in strong terms of condemnation. The conduct of the plaintiff not unnaturally suggested to the minds of union members such words as "traitor," "spies," and "despicable." Instances are not wanting where disloyalty to secret societies and other organizations, both political and nonpolitical, has been condemned in language not less forceful. The condemnatory words in the article before us were applied to the drivers in connection with

the facts stated; they were not intended to apply to the drivers generally or in connection with any other matter. Discussing the question when defamatory words in a communication may be considered as affording, by themselves, evidence of malice, Odgers, in his work on Libel and Slander (5th Ed.), says at page 354: "But the test appears to be this. Take the facts as they appeared to the defendant's mind at the time of publication; are the terms used such as the defendant might have honestly and *bona fide* employed under the circumstances? If so, the judge should stop the case. For if the defendant honestly believed the plaintiff's conduct to be such as he described it, the mere fact that he used strong words in so describing it is no evidence of malice to go to the jury."

In view of all the circumstances, we do not believe that the qualifiedly privileged character of the article in question was lost by reason of the language used.

The action of the trial court in dismissing the suit was right.

The judgment is affirmed.

Mr. Justice Burke concurs in the result.