NEWARK TRUST COMPANY, a corporation of the State of Delaware, Defendant Below, Appellant, v. GEORGIA BRUWER, Plaintiff Below, Appellee.

(*May* 23, 1958.)

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*William Prickett* and *William Prickett, Jr.,* for appellant.

*Harold Leshem* for appellee.

Supreme Court of the State of Delaware, No. 46, 1957.

SOUTHERLAND, C. J. (for the majority of the Court):

This is an action of slander brought by Mrs. Georgia Bruwer, plaintiff below, against Newark Trust Company, defendant below. The sole question before us is whether there was sufficient evidence of malice to warrant the trial judge in submitting the case to the jury.

We must, of course, view the evidence in the light most favorable to plaintiff. If it is so viewed, plaintiff made the following case.

Toward the end of the year 1955 there was presented to Newark Trust Company several checks on depositors' accounts the signatures of which were forged. One of these checks had been cashed at the bank's drive-in station. On that check the teller had noted the license number of the car. Other checks had been cashed at various stores in Newark.

Mr. E. F. Matthews was the chief executive officer of the bank. He ascertained the name of the owner of the car referred to and went to see a Mr. Honis. Honis denied any knowledge of the matter.

On January 27, 1956 Mr. Matthews reported the forgeries to the Newark police. The matter was referred to the State Police and assigned to Detective Marinelli. The latter called to see Mr. Matthews at the bank on January 31 but Matthews was out.

On the morning of February 1 there occurred an incident that led up to the present suit.

Mrs. Georgia Bruwer and her husband had a joint account at the bank. Her husband was in the army overseas, and she was receiving a monthly allotment of $400. The checks were sent to the bank for deposit to the Bruwers' account.

About ten o'clock in the morning of February 1 Mrs. Bruwer called a teller at the bank, Mrs. Jackson, and inquired whether the allotment check had arrived. She understood Mrs. Jackson to say that it had arrived. Mrs. Bruwer went to the bank about eleven o'clock, drew a counter check for $150, and presented it for payment to another teller, Mrs. Matthews. Mrs. Matthews ascertained that Mrs. Bruwer's balance was forty-seven cents, and declined to pay the check. Mrs. Bruwer then told Mrs. Matthews of her conversation with Mrs. Jackson, who was then out to lunch. Mrs. Matthews ascertained that the allotment check had not been received. Mrs. Bruwer testified that she was annoyed, but said she would be back in a few days. Mrs. Matthews asked her to speak to Mr. Matthews, and took her and the check to Mr. Matthews' desk at the rear of the bank. After explaining the situation and giving the check to Mr. Matthews, Mrs. Matthews left them.

The details of their conversation are in dispute. It appears that Mr. Matthews explained to Mrs. Bruwer that the bank could not pay on uncollected funds, and that Mrs. Bruwer told him that since a government check was involved the bank would be sure to get its money. According to Mrs. Bruwer, Mr. Matthews was "rough" or impolite, and "treated [her] mean". Mrs. Bruwer left without taking her counter check. According to her, "he [Matthews] kept that" check.

Sometime later, but before two o'clock, Mr. Matthews noticed a similarity between the signature on the Bruwer check and the signature on the forged checks. The particular similarity was apparently the formation of a capital "G". He showed to his associate, Mr. Pettit, vice president, Mrs. Bruwer's check and one of the forged checks. Mr. Pettit said that there was a possibility they were written by the same person, but an expert would be needed.

About two o'clock of the same day, Detective Marinelli came to the bank and asked to see Mr. Matthews. An employee took him to Mr. Matthews' desk. What occurred at the interview is in dispute. Marinelli first testified that at the outset of the interview Mr. Matthews greeted him with the statement: "that dirty bitch", or "that dirty rotten bitch". Since the men were unacquainted, and since Marinelli was in plain clothes and had not come by appointment, the statement seems incredible. But Marinelli also testified on further examination that the statement might have been made later in the course of the interview. His recollection of the details of the conversation was evidently hazy, and the sequence of the conversation was left in some confusion. But it is clear that Matthews showed Marinelli the forged checks, and also the Bruwer check, and that he called Marinelli's attention to the similarity of handwriting above referred to. Marinelli agreed that there was such a similarity. Mr. Matthews also told Marinelli of the earlier attempt by Mrs. Bruwer to cash the $150 check.

The weight and credibility of Marinelli's testimony taken as a whole was for the jury. Viewing it in the light most favorable to plaintiff, we think that the jury could have found (1) that Mr. Matthews communicated to Marinelli a suspicion that Mrs. Bruwer was the forger, and (2) that at some time during the conversation he spoke the offensive phrase above quoted, and (3) that the phrase referred to Mrs. Bruwer.

Whether at that interview Mr. Matthews called Marinelli's attention to the license number on the back of one of the forged

checks is in doubt. Mr. Matthews said that he did so; Marinelli first corroborated this, but later said that he thought it was at a second interview that he was told of the license number.

On February 22 Marinelli called upon Mrs. Bruwer. He told her that he was investigating the matter of the forged checks, and that he had several checks and one of them was a counter check for $150 which he presumed was hers. Mrs. Bruwer said that it probably was hers. Marinelli then pointed out the similarity of the handwriting on her check and the writing on one of the other checks. He informed her that she was a suspect. According to Mrs. Bruwer he told her that the Newark Trust Company suspected her. After some further investigation Mrs. Bruwer was arrested and charged with forgery.

Some time later Detective Marinelli obtained from Mrs. Honis, the wife of the man whom Mr. Matthews had interviewed, a full confession that she was guilty of the forgeries. This action was thereafter brought.

Since the imputation of the crime of forgery was made by Mr. Matthews to a police officer in connection with the latter's official duty to investigate the forgeries, it was clearly a privileged utterance, if made without malice. *Cameron v. Cockran,* 2 *Marv.* 166, 42 *A.* 454. Counsel were and are agreed upon the applicability of this principle of law. The question therefore is: Is there any evidence that the imputation of forgery to Mrs. Bruwer was maliciously made?

The crucial bit of evidence relied on by plaintiff is, of course, the application to Mrs. Bruwer of the phrase above quoted. We inquire: Might the jury infer malice from the use of this epithet and from the circumstances under which it was made?

We think that the following view of the matter is within the permissible bounds of reasonable inference:

The extreme coarseness and offensive nature of the epithet —"dirty rotten bitch"—was not justified by a mere suspicion of

forgery, based on nothing more than a surface similarity in handwriting. It might be attributed to a strong feeling of resentment and anger, generated originally by the episode of the morning, and designed to prejudice the investigating officer against Mrs. Bruwer. It is certain that Marinelli's first investigation was directed to Mrs. Bruwer. He testified that the circumstances were such that if he did not receive the cooperation of Mrs. Bruwer he would sign a warrant personally for her arrest—as he later did. Moreover, the offensive epithet was not spoken in connection with a sudden and unexpected discovery of suspicious circumstances, or in the course of a heated dispute with the suspected person herself. In such cases harsh or offensive language has sometimes been regarded as excused by the excitement of the moment, and hence as insufficient proof of active malice. See *Gust v. Montgomery Ward & Co.*, 229 *Mo. App.* 371, 80 *S. W.* 2d 286; *McKenzie v. William J. Burns International Detective Agency*, 149 *Minn.* 311, 183 *N. W.* 516; *Fahr v. Hayes*, 50 *N. J. L.* 275, 13 *A.* 261.

In the instant case the offensive words were deliberately spoken some time after the discovery of the suspicious circumstances of handwriting similarity, and not in the course of any acrimonious dispute with the plaintiff. The jury might, we think, have drawn the inference that the words were spoken in an attempt to damage Mrs. Bruwer in the estimation of the police. If so, the qualified privilege was abused.

It is quite true that the jury could have reasonably rejected these inferences, and could have concluded that the offensive language was nothing but an expression of momentary irritation, and that Mrs. Bruwer's unfortunate experience was attributable solely to dilatory and inefficient police work. But where two reasonable inferences are possible, the question is, of course, for the jury.

We think the trial court did not err in submitting the issue for decision.

The judgment below is affirmed.

BRAMHALL, Justice (dissenting).

I do not agree with the decision of the majority in this case. In my opinion the judgment of the Superior Court should be reversed and judgment entered for defendant.

The basis of plaintiff's action is a statement made by Matthews, the chief executive officer of defendant, to an investigating officer of the State Police to the effect that the handwriting on plaintiff's check was similar to that on several forged checks which had been paid by defendant. The statement was qualifiedly privileged. There is no extrinsic evidence of any kind of malice. The only evidence which could possibly have any bearing at all on the question of malice was Matthews' comment to the investigating officer. The majority say that the extreme coarseness and offensive nature of this language might be attributed to a strong feeling of resentment and anger which might have been the result of plaintiff's desire to prejudice the investigating officer against plaintiff, thus leaving to the jury the question of determining whether or not express malice had been proven. The majority also say that the use by Matthews of the offensive language complained of is not excusable as having been said "under the severe excitement of the moment"— as expressed in some of the authorities cited in the opinion of the majority—because this language was not used under such circumstances.

Before considering the merits of these two points, I pause first to say that to me they seem to be somewhat inconsistent. In the first, the jury is permitted to infer that because of the anger and resentment built up in Matthews' mind he may have been led to use the language complained of to injure plaintiff by persuading the investigating officer to issue a warrant for her arrest. In the second, the majority say that the use of this offensive language is not excusable because it was *not* used in the "excitement of the moment." I am unable to reconcile these two statements.

Offensive language, of itself, is not always sufficient to prove actual malice in a case where, as here, the statement complained of is privileged. Nor will the fact that Matthews may have felt indignation and resentment towards plaintiff necessarily destroy the qualified privilege. *Kroger Grocery & Baking Company v. Yount,* 8 Cir., 66 F. 2d 700, 92 *A. L. R.* 1166. See *Prosser on Torts,* Ch. 19, Section 95, and *Restatement of the Law of Torts,* Section 603. A trial court will in each case look to the primary motive or purpose by which a defendant is inspired. *Murphy v. Johns-Manville Products Corp.,* 45 N. J. Super. 478, 133 *A.* 2d 34. If the purpose in this case was solely to proceed with the investigation of the forged checks, as would seem to be the case, the defense of privilege would not be lost.

Matthews at no time accused plaintiff of forgery. The investigating officer to whom Matthews made his complaint testified (and his testimony is uncontradicted) that after his conversation with Matthews on the day in question he took complete responsibility for everything which he did. In this setting the evidence proves nothing more than a natural reaction of anger and resentment, expressed, it is true, in the language of the man of the street, by one who has been led to believe from the facts presented to him that the handwriting on the checks was similar.

I think that in view of the circumstances above set forth Matthews' statement may very well have been made in the heat of anger. Plaintiff had endeavored to cash a check for $150 when she had forty-nine cents in the bank. After the matter had been called to Matthews' attention, he noticed a similarity between the handwriting on the check of plaintiff and several forged checks in his possession. This similarity was verified a very short time later by two other employees of defendant. All these facts occurred within a very short time prior to Matthews' meeting with the investigating officer. In fact, when the investigating officer called, Matthews still had the checks in his hand. I think that the cases cited in the opinion of the majority as authority for the statement that offensive language is sometimes regarded

as excused by the excitement of the moment and therefore insufficient proof of express malice are applicable here.

I question whether it is always true that one is excused for the use of offensive language only in those cases where it is used during the excitement of the moment. Necessarily it would not be true in every case involving writings or publications. See annotation in 166 *A. L. R.* 114, 144. There is always a tendency on the part of the courts when the occasion is privileged not to submit the words used to a too strict scrutiny but to consider them in the light of the facts as they appear to defendant. *Peoples Life Insurance Co. of Washington v. Talley*, 166 *Va.* 464, 186 *S. E.* 42; *Sylvester v. Armstrong*, 53 *Wyo.* 382, 84 *P.* 2d 729; *Bereman v. Power Pub. Co.*, 93 *Colo.* 581, 27 *P.* 2d 749, 92 *A. L. R.* 1024. Considering the fact that extrinsic evidence of malice is wholly wanting in this case, that there is no evidence of ill will, spite or grudge against the plaintiff and that prior to the time plaintiff called at the bank on the date in question Matthews did not even know plaintiff, the facts of this case are at least as consistent with the non-existence of malice as with its existence. Under such circumstances a trial judge should direct a verdict for defendant. *Montgomery Ward and Co. v. Watson*, 4 *Cir.*, 55 *F.* 2d 184, 187; *Kroger Grocery & Baking Company v. Yount, supra.*

I should reverse the judgment for plaintiff and enter judgment for defendant.