Franz O. WILLENBUCHER, Plaintiff,

v.

Thomas C. McCORMICK, Defendant.

Civ. A. No. 8503.

United States District Court
D. Colorado.

May 19, 1964.

Hindry, Erickson & Meyer, C. Henry Roath, Denver, Colo., for plaintiff.

Murray, Baker & Wendelken, J. Hartley Murray, Colorado Springs, Colo., for defendant.

DOYLE, District Judge.

Captain Franz O. Willenbucher, USN (Ret.), the Executive Vice-President and legal counsel of the Retired Officers Association, a resident of Maryland, is the plaintiff in this libel action. The defendant is Colonel Thomas C. McCormick, USA (Ret.), a member of the Retired Officers Association and a Delegate to the 1962 National Convention of that Association. From the record it would appear that the Association is currently embroiled in internal controversy, some members and Chapters regarding themselves as part of the "Loyal Opposition" which "group" appears to be dissatisfied with the performance of the current national leadership, of which Captain Willenbucher is a part.

The allegedly defamatory statements published by Colonel McCormick are contained in two documents. The first of these, which appears in full in the file,

is a circular, an eight page account containing Colonel McCormick's impressions of the 1962 National Convention and of various contemporary incidents which reflect the tension existing within the Association. This document was apparently distributed exclusively to members of the Association, primarily those residing in Colorado. The language used throughout this document is somewhat intemperate, but we must be mindful that it was addressed to men who have been professional soldiers. In essence, it charges that Captain Willenbucher's administration of the Association has been characterized by arrogance, ineffectiveness, extravagance and favoritism. The second document is a letter written by Colonel McCormick to General Joseph H. Harper, USA (Ret.), a resident of the District of Columbia, in response to General Harper's circular letter inviting Colonel McCormick to join a related organization, the Military Order of World Wars. The most extreme language used by Colonel McCormick in this letter is as follows:

"Undoubtedly you have not seen the report of the Convention as I wrote it up, and copies of which were sent to all Directors of the Association, in addition to its wide distribution to chapters all over the United States, with primary distribution to all members in the State of Colorado.

"In this report I mentioned Major General Harper in three separate paragraphs, in a not too complimentary way. I referred also to your two close friends, Murphy and Willenbucher, who, in my opinion and that of many others, have downgraded the Association to a depth from which I doubt it will ever recover. It is surprising to me, that a General officer with your background ever gave your apparent cooperation to the seeming machinations they, particularly Willenbucher, have resorted to for securing the nomination and election of a set of directors who will support them and their policies as well as their method of op-

erations, in perpetuating them in office at salaries which have not been disclosed.

"After reading the Admiral Heffernan charges against them, and which he appears to have substantiated to a high degree my opinion of them is that of two confidence men, who should be following carnivals and medicine shows, instead of being in the executive positions they hold in the Association."

The plaintiff alleges that the language used in the last quoted paragraph imputes specific criminal conduct to the plaintiff; conduct in violation of C.R.S. '53, 40–10–5, which is quoted in plaintiff's brief. It must be doubted whether such is the case. In context it seems clear that the term "confidence men" is being used merely as a derogatory epithet of general nature, and in no sense as an accusation that the plaintiff had committed a specific criminal act which might, in certain jurisdictions, bear the appellation "confidence game."

There are several legal problems raised by the motion and while it is not possible to dispose of all of these here now, some threshold comments may serve to "clear the air" somewhat.

## I.

### WHAT LAW GOVERNS

As a preliminary matter it is necessary to determine which state's substantive law of libel applies to this action. The first claim for relief, alleging multistate publication of the eight page report, is said by both plaintiff and defendant to arise under Colorado law inasmuch as the defendant composed and mailed the report in Colorado, primarily but not exclusively to Colorado members of the Association. The defendant contends that the second claim for relief, alleging publication of the letter to General Harper by delivery thereof to his home address in the District of Columbia, arises under the law of the District of Columbia. The plaintiff urges that both claims for relief be deemed to be governed by Colorado law in view of the

facts that the forum court is in Colorado, that the defendant is a resident of Colorado who wrote and mailed the letter in question in Colorado, and that the letter complained of is integrally related to the report which was distributed primarily in Colorado. The plaintiff further urges that if the first claim for relief be deemed to be governed by the law of Colorado, the second claim, being related thereto, should also be deemed to be governed by the law of Colorado. Defendant relies on the case of Interstate Transit Lines v. Crane, 100 F.2d 857 (10th Cir. 1938) for the proposition that the Colorado choice-of-law rule is that the law of the place of injury controls in actions for libel.

As to the first claim for relief, the defendant urges the place of injury was Colorado, where primary distribution of the report was made—but it appears that wide distribution of the report was made in many, if not in all, states to all Directors of the Association, and to chapters of the Association "all over the United States."

As to the second claim for relief, defendant maintains the place of injury was the District of Columbia, where General Harper, the recipient of the letter, has his residence. It seems that Captain Willenbucher is known to members of the Association in all states, and that conceivably there could be impact in all states.

In the case of a defamation published in many states the oft-repeated (but recently criticized) choice-of-law rule in torts cases that the governing law is the law of the place of injury breaks down entirely. As critical commentators and a growing number of courts have recently recognized, a different rule is needed in torts cases generally. See Pearson v. Northeast Airlines, 309 F.2d 553, 92 A.L.R.2d 1162 (2nd Cir. 1962); Kilberg v. Northeast Airlines, 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (N.Y.Ct.App.1961); Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (N.Y.Ct.App.1963); Ehrenzweig, Conflict of Laws, §§ 211–216 (1962); Currie, The Constitution and the Choice of Law: Governmental Interests and the Judicial Function, 26 U. Chi.L.Rev. 9 (1958). As Ehrenzweig summarizes his recommendation with respect to wrongful death actions:

"Nothing less will do, I submit, than to cast aside the remnants of obsolete [vested rights] doctrine which have forced the New York court into its ambiguous ruling [in Kilberg v. Northeast Airlines]. There is no reason, and there never has been a reason, for compelling the forum to apply the lex loci. Once this relic of vested rights dogma has been finally abandoned—and this the New York Court of Appeals has not yet done explicitly—the way is open to an analysis which will discriminate between heterogeneous fact situations.

"(1) Here, as elsewhere, the law of the forum is the starting point (§ 106 [Conflict of Laws (1962)]). This law will be displaced only if there is a compelling reason for doing so.

"(2) Such a reason exists where in an automobile or private airplane accident the wrongful death occurred in an operation participated in by both parties both of whom were domiciliaries of the same state. In that case the law of that state will be applied as that whose impact both parties could have reasonably foreseen (§ 226 [Conflict of Laws (1962)]).

"(3) In all other cases the lex fori remains applicable unless either the plaintiff or the defendant has been forced into a forum devoid of any such contact as would justify application of its own law." Conflict of Laws, § 213 at 555 (1962)

Commenting specifically on the results which courts have actually reached in determining what law applies in the case of an interstate defamation, Ehrenzweig notes:

"Not a single international conflicts case has been found in which

a foreign law was actually applied, although there were strong foreign contacts in some of them. And even in those very few interstate cases in which a true conflict was squarely faced, the decision was in effect reached under the lex fori." Conflict of Laws, § 216 at 566 (1962)

The decision in the case of Interstate Transit Lines v. Crane, supra, is no exception to this generalization. Therein there was no express holding on rehearing as to which state's substantive law governed the merits. Counsel for both parties merely assumed, during oral argument, that, under the weight of authority at that time (which accepted without reservation the "vested rights" theory), the law of Missouri, the state wherein allegedly libelous data was finally supplied to a surety company, would govern. It was specifically observed, however, that Missouri law did not differ from the law of the forum state, Colorado. The original decision, affirmed on rehearing, did apply the law of Colorado, the state where the defamatory statement was prepared and mailed.

■ Under the circumstances of this case we are of the opinion that the substantive law of libel which governs both claims here presented is the law of Colorado, the forum state, wherein defendant resides, and wherein defendant composed and mailed the allegedly libelous report and letter. No convincing reason for displacing the law of the forum appears here. Since the crucial question with respect to both claims has to do with the state of mind of Colonel McCormick while acting in Colorado, it is unreasonable to apply a different substantive law of libel to the two claims.

## II.

## WHETHER THE WORDS ARE DEFAMATORY

As suggested above, the words are not unquestionably defamatory. The long discussion which is set forth in Count I of the complaint does not charge the violation of a criminal law, but this is in essence a libel case. Decisions relied upon by counsel for the defendant are slander cases and the law applicable to defamation per se in a slander case is wholly different from that which applies to libel per se. Libel per se is broadly defined in some of the Colorado cases. See, for example, Morley v. Post Printing and Publishing Company, 84 Colo. 41, 268 P. 540, and see also Knapp v. Post Printing & Publishing Co., 111 Colo. 492, 144 P.2d 981. The definition contained in the Knapp case is as follows:

"A definition of libel which has received general acceptance and approbation is to be found in 33 American Jurisprudence, page 38, section 3. It reads: 'A libel is a malicious publication, expressed either in printing or writing, or by signs and pictures, tending either to blacken the memory of one who is dead, or the reputation of one who is alive, and expose him to public hatred, contempt, or ridicule.' See, also, 36 C.J. p. 1143, § 3. Criminal libel in Colorado is defined in section 199, chapter 48, '35 C.S.A., in almost identical words, as follows: 'A libel is a malicious defamation expressed either by printing, or by signs, or pictures or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural defects of one who is alive, and thereby to expose him or her to public hatred, contempt or ridicule."

■ It is thus clear that defendant's contention that some crime must be charged in order to constitute defamation per se is incorrect. Nevertheless, from a fair reading of the statement which is the basis of Count I of the complaint, it cannot be readily concluded that the publication in question is a malicious one tending to impeach the honesty, integrity, virtue or reputation of the plaintiff, thereby exposing him to public hatred, contempt or ridicule. Moreover, it is questionable whether the words in dispute can be regarded as words actionable per quod since they leave little

room for the introduction of extrinsic explanations. In other words, they are either actionable on their face or not at all. This question can, however, be left open until a pre-trial conference at which time it should be argued specifically and fully.

Turning now to the words "confidence men" which were contained in the letter written to General Harper, we note that the plaintiff relies on the criminal definition of this term as establishing its defamation *per se* character. It is true that the Colorado statute contains such a definition as part of the crime of confidence game. There is some question in the Court's mind, however, as to whether the term was employed in the manner alleged by plaintiff. But even if the words were not used in this sense, it does not follow that they are not actionable *per se* since, as has been noted, a violation of the criminal laws is not essential if the words satisfy the definition approved in the cases.

### III.

### THE QUESTION OF PRIVILEGE

The existence of a qualified privilege effectively shifts the burden of proof with respect to the element of malice to the plaintiff. There is a presumption of malice where words actionable *per se* are published; if, however, the occasion is a privileged one, the plaintiff must prove that the words were maliciously published. See Ling v. Whittemore, 140 Colo. 247, 343 P.2d 1048. The question whether the words were published maliciously is generally for the jury. See Ling, supra.

It seems plain that the occasions involved in the instant publications were privileged in that the information was distributed to members of a group and the publisher was apparently advancing group interest in each instance.

The definitive Colorado decision on group privilege is Bereman v. Power Publishing Co., 93 Colo. 581, 27 P.2d 749, 92 A.L.R. 1024. In rendering its decision that the statements in Bereman were

qualifiedly privileged, although published in a union newspaper circulated to persons other than the members of the Laundry Drivers Union, the Court said:

"The law on this branch of the case is settled in this state. * * * A communication made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contains incriminatory matter, which, without this privilege, would be slanderous and actionable; and this, though the duty be not a legal one, but only a moral or social duty of imperfect application [obligation]." [Brackets in original] 27 P.2d at 751.

The communications in that case were held to be privileged, and the action of the lower court in dismissing the action was sustained even though the allegedly defamatory language was so virulent as to characterize the plaintiff as one of the "most despicable characters known to organized labor—and any other fair minded persons—call them what you will, the worst is none too bad," and to label him as a spy and a traitor who had "sold [his] manhood, if [he] ever possessed any, for a paltry few dollars."

The allegedly defamatory statements in the instant case were less widely circulated, apparently going only to the directors of the Retired Officers Association and to other members of the Association; the allegedly defamatory language is hardly more virulent. We could, in the instant case, agree with the observation made by the Court in the Bereman case, that:

"Some of the words in the article in question are in bad taste, no doubt. Less offensive words might have been selected. But we must not overlook the fact that disloyalty to a union is fraught with such possibilities of disaster to the union cause that loyal union members may

be excused for referring to it in strong terms of condemnation. The conduct of the plaintiff not unnaturally suggested to the minds of union members such words as 'traitor,' 'spies,' and 'despicable.' Instances are not wanting where disloyalty to secret societies and other organizations, both political and nonpolitical, has been condemned in language not less forceful.

\* \* \* \* \* \*

"In view of all the circumstances, we do not believe that the qualifiedly privileged character of the article in question was lost by reason of the language used." 27 P.2d at 752.

■■ As a matter of law, then, communications between members of a fraternal, social, professional, religious or labor organization concerning the conduct of other members or officers in their capacity as such are qualifiedly privileged. Cf. Anno. 63 A.L.R. 649, 92 A. L.R. 1029. The language used in the instant case is, in context, hardly more virulent than that used in Bereman; it was less widely circulated, apparently only to members of the organization by letter rather than to all veterans or veterans organizations by means of a published article; and it very clearly related to matters of concern to the Retired Officers Association and its members. The statements made in the instant case, we are constrained to hold, are no less privileged as a matter of law.

In spite of the fact that the allegedly libelous communications made in the instant case are qualifiedly privileged, it would be improper at this stage to dismiss the complaint. In Bereman the plaintiff was nonsuited, and the action dismissed but, apparently, only after plaintiff had presented his evidence, which evidence, in the view of the court, showed only the use of words such as must have been used honestly and in good faith by the defendant, permitting withdrawal of the cause from the jury.

The proper rule was, however, stated in the decision in Bereman:

"The communication being qualifiedly privileged, no right of action arose unless the publishers were actuated by express malice, and the burden of proving express malice was on the plaintiff. The presumption is that the communication was made in good faith and without malice. \* \* \* Assuming that the statements in the article were false, such falsity, of itself, is not sufficient to raise the inference that they were maliciously inspired. \* \* \* There was no evidence of express malice, nor was there evidence of facts from which express malice might be inferred." 27 P.2d at 751.

■ In the instant case the plaintiff has not yet presented his evidence. Dismissal of the complaint is therefore not warranted, because the plaintiff has not yet been given the opportunity to prove, as he must if he is to recover, that the derogatory statements made by Colonel McCormick exceeded the limits of his qualified privilege in that they were actuated by express malice toward Captain Willenbucher personally rather than by a bona fide desire to protest against mismanagement of the Association in which he and his communicatees were members. The rule which delineates between the function of judge and jury in such defamation cases as are similar to the one at bar was stated by the Colorado Supreme Court in Ling v. Whittemore, supra, to be:

" \* \* \* Denver Public Warehouse Co. v. Holloway, 34 Colo. 432, 83 P. 131, 3 L.R.A.,N.S., 696; Melcher v. Beeler, 48 Colo. 233, 110 P. 181; Bereman v. Power Publishing Co., 93 Colo. 581, 27 P.2d 749, 92 A.L.R. 1024 and Hoover v. Jordan, 27 Colo.App. 515, 150 P. 333 all recognize that, depending upon the circumstances, one has a privilege to communicate in good faith printed or written matter to another notwithstanding that it is defamatory where the publisher is promoting a legitimate individual, group or public interest. In the Denver Public

Warehouse Co. case [34 Colo. 432, 83 P. 132], quoting from Newell on Slander and Libel, the Court said:

" ' * * * "A privileged communication is an exception to the rule that every defamatory publication implies *malice*. A qualified privilege is extended to a communication made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty either legal, moral or social, if made to a person having a corresponding interest or duty, and the burden of proving the existence of malice is cast upon the person claiming to have been defamed. * * * 'The theory of privilege in connection with the law of defamation involves a variety of conditions of some nicety, and also a doctrine not always of easy application to a set of facts, and, such being the case in any trial, whether civil or criminal, while the questions of libel or no libel, malice or no malice are matters of fact for the jury, the question of privilege or no privilege is entirely one of law for the judge. That is to say, it is exclusively for the judge to determine whether the occasion on which the alleged defamatory statement was made was such as to render the communication a privileged one. The jury, however, will be the proper tribunal to determine the question of express malice, where evidence of ill will is forthcoming; but if, taken in connection with admitted facts, the words complained of are such as must have been used honestly and in good faith by the defendant, the judge may withdraw the cause from a jury and direct a verdict for the defendant.' " ' " 343 P.2d at 1049–1050

Because it can not now be determined whether Colonel McCormick was actuated by express malice of the sort which would defeat the conditional privilege to communicate otherwise defamatory statements concerning Captain Willenbucher's acts in his capacity as an officer of the Association to other members and officers of the Retired Officers Association the defendant's motion for dismissal of the complaint must be denied. It is, therefore,

Ordered that the motion praying dismissal of the complaint should be, and hereby is, denied.