**Earnest PICKINGS et al., Appellants,**

**v.**

**Imon E. BRUCE et al., Appellees.**

**No. 19881.**

United States Court of Appeals, Eighth Circuit.

Aug. 6, 1970.

Burl C. Rotenberry, of Walker, Rotenberry, Kaplan, Lavey & Hollingsworth, Little Rock, Ark., for appellants; John P. Sizemore, Little Rock, Ark., and Jack Greenberg and W. Haywood Burns, New York City, on the brief.

G. Ross Smith, Little Rock, Ark., for appellees; Robert V. Light and Herschel H. Friday, Little Rock, Ark., on the brief.

Michael Nussbaum, Surrey, Karasik, Green & Hill, Washington, D. C., amici curiae.

Before VOGEL, HEANEY and BRIGHT, Circuit Judges.

HEANEY, Circuit Judge.

This appeal concerns the right of college administrators to sanction a student organization, its officers and faculty advisors, for writing a letter to an off-campus church questioning its policies on integration and for refusing to accede to a request of the college administrators to cancel a speaking invitation extended by the organization.

The events which form the basis of this appeal occurred on the campus of Southern State College in Magnolia, Arkansas, during the 1968–69 school year.

Shortly after the beginning of the fall term, a small group of students organized a biracial student organization, Students United for Rights and Equality (SURE). It was officially recognized by the College in late October, 1968. Its stated purposes were:

"1. To provide an organized program of leadership and participation among representatives of all races, nationalities and religions.

"2. To provide service to the college in order to assist in the realization of its goals.

"3. To stimulate closer relationships among members of all races, nationalities and religions.

"4. To provide members an opportunity to develop philosophies regarding human relations.

"5. To provide recognition for members for their contributions in assisting the organization to fulfill its purposes."

On Sunday, December 8, 1968, five black female students attempted to attend services at the College View Baptist Church, an off-campus, all-white church. Since the church was not integrated, the students were asked to leave. This incident was reported to SURE. Its members voted to authorize the writing of a letter to the pastor of the church. The student Publicity Chairman of SURE wrote the letter on behalf of the organization. The letter set forth SURE's understanding of the incident, advised that the action of the church was un-Christian, and requested an explanation.[1] A copy of the letter was mailed to the President of the College, Imon Bruce.

President Bruce investigated the matter, criticized those involved in the incident, asked the student who authored the letter to resign from his elected position with SURE, and asked SURE's two faculty advisors, both of whom had approved of the letter, to resign from their advisory positions. The student and advisors resigned as requested but retained their membership in the organization. Subsequently, one of the two resigned faculty advisors was directed by President Bruce to limit his activities at the College to teaching, to restrict his advising to teaching situations, and to refrain from sponsoring any college organization or program. SURE was placed on probation for the remainder of

---

1. The letter written to the church is set out as Appendix A to this opinion.

the academic year because of its involvement in the church incident, the implied terms of probation being that SURE would confine its activities to the campus.

A second incident occurred in March, 1969. SURE invited Mr. and Mrs. Joe Neal, representatives of the Southern Students Organizing Committee, to attend the regular monthly meeting of SURE, to show an AFL–CIO produced film, "The Face of the South," and to discuss the film after it had been shown. At the time this invitation was extended, Southern State College permitted student groups to host speakers on campus, but the College had no policy, written or otherwise, with respect to such events.

President Bruce learned of the invitation to the Neals on March 19, 1969, the day before the Neals were scheduled to speak. He decided that the Neals' appearance would substantially disrupt the educational functions of the College. He requested SURE's President and its two new faculty advisors to cancel the invitation. They refused. On the following day, the Neals made their scheduled appearance. There were no incidents related to their campus visit.

On March 21, 1969, Donald Haefner, Dean of Students, orally informed SURE's President that SURE was temporarily suspended, as of that date, for disobeying the administration's request to cancel the Neals' appearance. On March 24, 1969, Dean Haefner, in a letter to SURE, confirmed the temporary suspension of SURE's charter. He wrote that the suspension was based on the failure of SURE's officers to cancel the speaking invitation to the Neals. He noted that the Student Senate and the Student Affairs Committee would review the suspension and that a final decision as to whether the organization would be censured, placed on probation with conditions, or temporarily or permanently suspended would be made by the Dean of Students subject to appeal to the President of the College and the Board of Trustees.

The Student Senate voted against SURE's suspension. The charter suspension remained in effect, however, while the matter was being reviewed by the administration's Student Affairs Committee. Prior to the final action on the suspension by the Student Affairs Committee, several of the officers, advisors and members of SURE commenced an action in the United States District Court under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 asking for a declaratory judgment and injunctive relief.[2]

The matter was tried to the District Court. At the close of the testimony, the court concluded: (1) that the members and advisors of SURE reasonably should have known that it was not authorized to intrude upon the policies of an off-campus church; (2) that the conditions prevailing on-campus the day before the Neals were scheduled to speak were such that the administration could reasonably have anticipated that the Neals' appearance would materially and substantially interfere with the work of the school; and (3) that the actions taken and the sanctions imposed by the defendants did not infringe upon the plaintiffs' constitutional rights. The court denied the plaintiffs' request for an injunction and dismissed the complaint without prejudice. However, recognizing the need for SURE at Southern State College, the court stated:

" * * * [T]his is an organization that could very well serve a purposeful and useful need on this campus. * * * If they are prohibited from doing it, it would seem to me that the purpose of the organization would not be carried out. * * * I think one

---

2. The named plaintiffs, being some of the officers, advisors and members of SURE, brought this suit as a class suit on behalf of themselves, other members of SURE and would be members of SURE. The named defendants are the President of Southern State College, the Dean of Students, and the members of the Board of Trustees.

referred to it as a gap, filling a gap, or a vacuum, that existed on campus. I have a feeling that the responsible administration of this school is not going to again leave that gap there for the possibility of subsequent incidents that could disrupt the entire college and its educational processes."

No question is raised on this appeal as to the jurisdiction of the District Court, the standing of the plaintiffs to bring this action, or the District Court's conclusion that the actions of the College's administrators constituted state action.

The primary question raised here is whether the defendants interfered with the plaintiffs' constitutional rights by restricting the plaintiffs for their parts in writing the letter to the church and in extending the speaker invitation to the Neals. For reasons stated below, we hold that the plaintiffs' First Amendment rights of free expression and association were violated.[3]

### THE LETTER TO THE CHURCH

Students and teachers retain their rights to freedom of speech, expression and association while attending or teaching at a college or university. Tinker v. Des Moines Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). They have a right to express their views individually or collectively with respect to matters of concern to a college or to a larger community. They are neither required to limit their expression of views to the campus or to confine their opinions to matters that affect the academic community only. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed.2d 811 (1968); Dickey v. Alabama State Board of Education, 273 F.Supp. 613 (M.D. Ala.1967), appeal dismissed 394 F.2d 490 (5th Cir. 1968). It follows that here the administrators had no right to prohibit SURE[4] from expressing its views on integration to the College View Baptist Church or to impose sanctions on its members or advisors for expressing these views. Such statements may well increase the tensions within the College and between the College and the community, but this fact cannot serve to restrict freedom of expression. Tinker v. Des Moines Community School Dist., supra, 393 U.S. at 508–509, 89 S.Ct. 733.

### THE SPEAKING INVITATION TO THE NEALS

Recent case law indicates that student organizations have a broad right to sponsor controversial speakers on-campus.[5] We have been unable to find a

---

3. The plaintiffs also contend on appeal that SURE was subjected to racial discrimination by the defendants. The District Court found insufficient evidence of such discrimination and, from our review of the record, we cannot say that its decision is clearly erroneous. See, Jones v. Sciacia, 422 F.2d 393 (8th Cir. 1970).

4. The rights guaranteed under the First Amendment apply to organizations as well as to individuals. See, New York Times Co. v. Sullivan, 376 U.S. 254, 255, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Kingsley International Pictures Corp. v. Regents of University, 360 U.S. 684, 79 S.Ct. 1362, 3 L. Ed.2d 1512 (1959); American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941).

5. Professor Charles Alan Wright, delivering the Oliver Wendell Holmes Lectures at Vanderbilt University in April of 1969, stated:

"A speaker cannot be refused permission to speak on campus because he has been convicted of a felony or is under indictment for murder, or because he urges or advocates violation of the laws, or because he is an admitted member of the Communist Party. A speaker may not be required to promise that he will not use his speech to publicize the activities of any 'subversive seditious, and un-American organization.' A forum cannot constitutionally be denied to 'subversive elements' nor even to groups seeking overthrow of the government by force or violence. It will not do to limit speakers to those who 'clearly serve the advantage of education' or to lease the auditorium only for programs 'determined to be compatible with the aims of [the college] as an institution of higher learning.'"

single case decided in the 1960's in which a speaker ban has been upheld by a federal court.[6] One limitation would appear to be that the administrators could enforce a ban, if they could reasonably forecast that the Neals' presence on-campus would substantially interfere with the work of school, the rights of students and the maintenance of appropriate discipline.[7]

The District Court adopted the *Tinker* test and justified its conclusion that substantial interference could be forecast upon three findings. First, SURE was on probation at the time it issued the invitation. This fact, however, cannot serve as a basis for the administration's action since the imposition of probation was, of itself, a violation of the plaintiffs' constitutional rights. Furthermore, the defendants emphasized in their testimony that the probation was not intended to restrict the plaintiffs in any way in their on-campus activities.

Second, the District Court concluded that "disruptive activities" were underway on-campus at the time that the invitation was extended. There is no evidence in the record, however, to support the court's finding. SURE had been chartered as an organization for six months prior to this incident. It had conducted its activities in a mature, responsible manner during that entire period. The campus had been completely peaceful during the entire period. Not only had it been free of incidents involving interference with the rights of students or faculty during the period, but no demonstrations of any kind had taken place. It is clear from the evidence that the students and faculty were anxious about the war, the draft and racial injustice. It is also clear that these anxieties were sharpened by unrest on other college campuses and by the controversy arising from the letter to the church. But there is no showing that these tensions could reasonably have been expected to explode into aggressive, disruptive action or even group demonstrations simply because of the Neals' appearance on-campus for the purpose of showing a film.

Third, the court found that the Neals had a record and reputation for causing disturbances and had caused a disturbance at Henderson State College in Arkadelphia, Arkansas. There is no support in the record for the first conclusion, and only slight support for the second. The evidence shows only that the Neals were arrested on the Henderson campus for trespassing. There is no evidence in the record that the Neals had urged the students to violate any law or college regulation or that their appearance on-campus had resulted in any substantial interference with the rights of other students or with the work of school. The record shows only that the faculty had some difficulty in getting the students to return to their dormitories by the appointed hour after the Neals' arrests.

Upon a reading of the entire record, we are convinced that the administrators could reasonably have concluded no more than: that the Neals' appearance would expose the students and faculty to the

Wright, "The Constitution on the Campus," 22 Vand.L.Rev. 1027, 1051–1052 (1969).

6. Brooks v. Auburn University, 412 F.2d 1171 (5th Cir. 1969) ; Stacy v. Williams, 306 F.Supp. 963 (N.D.Miss.1969) (three judge court) ; Smith v. University of Tennessee, 300 F.Supp. 777 (E.D.Tenn. 1969) ; Snyder v. Board of Trustees of University of Illinois, 286 F.Supp. 927 (N.D.Ill.1968) (three judge court) ; Dickson v. Sitterson, 280 F.Supp. 486 (M.D.N.C.1968) (three judge court) ; Student Liberal Federation v. Louisiana

State University, Civ.No. 68–300 (E.D. La. February 15, 1968).

7. Tinker v. Des Moines Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed. 2d 731 (1969) ; Scoville v. Board of Education of Joliet Township, 425 F.2d 10 (7th Cir. April 1, 1970) ; Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966). See also, Hammond v. South Carolina State College, 272 F.Supp. 947 (D.S.C.1967). Although none of these cases involve speaker bans, we feel that the Supreme Court would apply this limitation here.

militant views of a couple that was seeking substantial change in race relations; that these views would be apt to exacerbate the tensions between the College and the community; and that these views would be apt to provoke discussions between students and encourage them to action. These conclusions, however, cannot justify an infringement of First Amendment rights:

" * * * [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, * * * and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society."

Tinker v. Des Moines Community School Dist., *supra,* 393 U.S. at 508–509, 89 S. Ct. at 737–738.

We hold that under the circumstances of this case, the defendants had no right to demand that the speaking invitation to the Neals be withdrawn nor to impose sanctions for the refusal to withdraw it.

## THE REMEDY

While there is testimony in the record indicating that the officers and advisors of SURE were discriminated against in their employment for their part in writing the letter to the church and in failing to cancel the Neals' speaking engagement,[8] neither the students nor the faculty seek redress in this suit for any such discrimination. The plaintiffs ask, rather, that SURE's suspension and probation be removed, and that the restrictions imposed upon the students and faculty serving as officers and advisors of SURE be lifted. They further request that a judgment be issued declaring the rights and legal relationship between the plaintiffs and the defendants and further declaring invalid and unenforceable any rules or regulations which have been or may be applied to plaintiffs' activities, which infringe plaintiffs' constitutionally protected rights by reason of vagueness or overbreadth.

For the reasons stated elsewhere in this opinion, we hold that SURE's suspension and probation must be removed. We also hold that any existing orders or directives prohibiting students or faculty[9] who participated in either incident from holding office in SURE or serving as an advisor to SURE must be rescinded.

We decline, however, to establish detailed policies with regard to off-campus activities and on-campus speakers. The defendants have the benefit of this opinion, the District Court's admonition and the recommendations of the Arkansas State Advisory Committee to the United States Commission on Civil Rights.[10]

---

8. It is clear from the record that none of the four faculty members, who served as advisors to SURE, returned to Southern State College for the 1969–70 academic year. Three of the four simply were not offered renewal contracts. A fifth faculty member, the Chairman of the Speech Department, was the author of a letter sent from the local chapter of the A.A.U.P. to President Bruce criticizing his handling of the faculty advisors to SURE after the letter to the church incident. This fifth faculty member was given a letter of non-reappointment. A student member of

SURE also had difficulty with employment. Ernest Pickings, the President of Sure, was denied a job as a dormitory counselor after he had previously been promised the job.

9. It is not clear from the record whether all of the students and faculty involved in these incidents have departed from Southern State College.

10. The Arkansas State Advisory Committee conducted an inquiry into the two incidents at Southern State College. They published a report in June, 1969, entitled

The defendants also have the benefit of other opinions and studies.[11] We are convinced that they will be able to develop constitutional policies in these sensitive areas without further detailed directives from this Court.

Reversed and remanded to the District Court for action consistent with this opinion.

## APPENDIX A

December 13, 1968
Public Relations Committee
Students United for
Rights and Equality
(S.U.R.E.) Southern
State College Magnolia,
Arkansas
Reverend James Schoenrock
College View Baptist Church
2111 N. Washington
Magnolia, Arkansas

Dear Sir:

On Sunday Morning, December 8, 1968, a small group of Southern State College students went to your church to attend worship services.

After the students were seated in the sanctuary, they were approached by a man, presumably a member of your congregation, who asked them to come with him to the church lobby. When they followed the man, at his request, into a room off the lobby, he asked them to leave the church. The reason he gave for asking these students to go somewhere else to worship was that the College View Baptist Church is not an integrated church and its members are not ready for integration.

The action of these college students in exercising their right to freedom of worship in a church of their choice was a purely individual action. However, since the promotion of social understanding and human rights are among the primary purposes of our organization, we feel obliged to inquire into the situation.

Action such as that taken by a man in your church on December 8 is not in accord with the basic tenets of Christianity, as you must be even more aware of than we are. Therefore, we respectfully request some explanation from you.

We ask you to let us know whether or not the man who escorted the students out of your church was a church official, or whether his behavior reflected a purely personal bias. We also wish to know whether your church has an official policy concerning the freedom of college students to worship among you without regard to race, creed, color, or national origin.

Sincerely yours,

/s/ Steven J. Bouley
Steven J. Bouley
Chairman, Public
Relations Committee

---

"Student Rights in Arkansas State Colleges—An Inquiry at Southern State College." The report was critical of the administrators' handling of the incidents and it suggested recommendations.

11. See, Soglin v. Kauffman, 418 F.2d 163 (7th Cir. 1969); Brooks v. Auburn University, *supra*; Stacy v. Williams, *supra*;

Van Alstyne, "The Judicial Trend Toward Student Academic Freedom," 20 U.Fla.L.Rev. 290 (1968); Wright, "The Constitution on the Campus," 22 Vand.L. Rev. 1027 (1969); "Joint Statement on Rights and Freedoms of Students," 53 A.A.U.P.Bull. 365 (1967); "Statement on the Academic Freedom of Students," 51 A.A.U.P.Bull. 447 (1965).