**Jim V. FISHER, Plaintiff-Appellant,**

**v.**

**Grant R. WALKER, Defendant-Appellee.**

**No. 71-1568.**

United States Court of Appeals, Tenth Circuit.

July 31, 1972.

William E. Doyle, Circuit Judge, filed dissenting opinion.

---

10. See also "Indemnity Between Negligent Tortfeasors: A Proposed Rationale," 37 Iowa Law Review 517, 1952.

A. Wally Sandack, of Draper, Sandack & Saperstein, Salt Lake City, Utah, for appellant.

Roger F. Cutler, Asst. City Atty. (Jack L. Crellin, City Atty., on the brief), for appellee.

Before LEWIS, Chief Judge, DOYLE, Circuit Judge, and WINNER, District Judge.

WINNER, District Judge.

Fisher was a Salt Lake City fireman, and Walker was the city's fire chief. Before 1969, the Salt Lake City Fire Department had two functioning organizations, the Firemen's Relief Association and the International Association of Fire Fighters, Local Union No. 1645 (herein called the union). The Relief Association had responsibility for insurance and welfare benefits, while the union was charged with responsibility for negotiation of wages and terms of employment. The union was composed of both firemen and officers, but in July, 1969, the officers formed a separate organization, the Salt Lake City Fire Officers' Association to handle their own individualized problems as officers. The formation of the Officers' Association met with extreme disfavor on the part of some union members, and Fisher, who was the union president, wrote "a letter from the president" in the September, 1969 issue of the local union publication, the *Fire Flyer,* and it is this letter which forms the nub of the controversy.

The letter in its entirety said:

"LETTER FROM THE PRESIDENT

"As we have informed you before, a separate officer's organization is not a legitimate part of the IAFF and the intentions of those who fostered the birth of this illegitimate organization are highly suspect. We call it an illegitimate birth because Lynn Marsh or Mayor Lee would deny having had any part in such conception, though we know those officers who instigated this organization met with them prior to its being conceived.

"We do not believe in the virgin birth of this organization since it has all of the characteristics of the parent (like its twins in other cities) of city managers trying to break the union.

"Those unfaithful fire fighters who crawl into bed with city officials, feeling no moral regress for their infidelity (and even boast about) their adulterous ways should be condemned by every firefighter. Their child is named Divide and Conquer. The parents of this child have found they could not, on their own, destroy the Union. Their mischievous child is Union destruction.

"Brothers there would not be such a push for the Union's destruction if we hadn't shown that by unity we had and showed a strength never before encountered and WE WERE EFFECTIVE!

"The action taken by those professing to represent the officers has taken every man on the job a *big* step backward because of the selfishness of a few officers who wanted everything for themselves.

"For those officers who want such an organization we ask two very important questions. 1. If there is only so much money for wages, who goes down to get it, the officers for them alone or the Union for everyone? 2. If the officers want separation at City Hall do the privates continue to support the lion's share of the officer pension or do they separate at the State level also?

"Every officer should ask those who are at the head of this 'officers organization' these questions and so should every private.

"Let us now re-unite and sluff off this chain so we can once more rattle the walls of City Hall for everyones benefit and get all of the things fire fighters deserve. There is a lot of

hard work left to do . . . . Let's do it together!"

In the same issue of the *Fire Flyer*, there was a reprint of an editorial originally printed in the magazine published by the international union, and in it the international president said:

"FIRE FIGHTER EDITORIAL ATTACKS DIVIDE AND CONQUER TACTIC

"The following article is a reprint of President Wm. Howard McClennan's editorial in your September, 1969, Fire Fighter Magazine.

### 'DIVIDE AND CONQUER' VS. THE IAFF

"A disturbing pattern of attempted 'divide and conquer' is emerging in the dealings of some city managers with the IAFF.

"Many city managers are attempting to demand that fire service officers drop their membership in IAFF local unions, or to 'insist' that they move to separate local unions.

"Except for a few of the very largest cities where separate locals for officers have an old, traditional place, the general principle of the IAFF has been to charter a single local union for each fire department. The reason is simple but compelling: In union there is strength.

"We have always known that all members of a fire service benefit when all those members join in a single voice to speak for the good of the fire service. Wages, hours, and other working conditions are interconnected, and the officers and men of a fire service each have a stake in improving the lot of all members of the service.

"Over the years, the IAFF has made enormous strides toward its goals of improved and adequate wages and working conditions, precisely because it has spoken for the vast majority of the professional fire fighters of the nation. The principle of a single local in a single fire service has proved itself time and time again. We like it and we're ready to fight for it.

"There is no good reason to abandon that principle, despite the few historic exceptions to it in large cities. Especially, we're not about to abandon that principle when the motives of the city managers who advocate abandonment are so obvious.

"They want to weaken the IAFF. We absolutely are not going to go along with them!"

The next issue of the *Fire Flyer* printed a second letter from Fisher:

"It has come to my attention that my letter in the September Fire Flyer needs clarification. It was directed to, *and only* to, those officers who instigated and organized the Officers organization.

"I have been told that some officers took exceptions to my letter because they thought it referred to them and they have always been faithful Union members; and have never taken action against the Union. To those officers, the vast majority of officers, they need not be offended because no offense was intended. My letter did not infer that all officers took part in organizing this officers group.

"The organization of officers, away from the rest of the fire fighters, does not and did not originate (as I pointed out in my September letter) with Salt Lake City. It is a well organized move across the country, on the part of city management, to stop the effectiveness of the IAFF because other public employees were 'catching on' and wanting to organize the same way.

"City management could see the hand writing on the wall. Already the police have organized as the fire fighters have. City management does not want Unions. They are afraid of them. City fathers cry great howls of anguish and indignation when employees unionize. They use the scare of a 'strike' threat against the public and a 'job' scare against the employee. We

have had both. What in truth city management is afraid of is that the *unions destroy the spoils system for political payoffs.* When a union is told there is no money for wages it looks around to see where the money is being spent. This can be political death for elected officials.

"It is as simple, yet as complicated, as that. This is what it is all about.

"*A separate officers organization, no matter how many times it is said contrarywise, is a NATION WIDE UNION BREAKING DEVICE,* aimed at making the largest, most effective public union, the IAFF, less effective and thus discourage more militant unionism of other public employees.

"WE HAVE GAINED SO MUCH IN THE IAFF UNION HERE THAT SALT LAKE IS USED AS AN EXAMPLE IN OTHER PARTS OF THE COUNTRY ON HOW TO USE UNIONISM. Is it any wonder that city hall wants to try and split apart our Union in hopes of less gain for unionism? Other city employees are not blind to what is going on in our union.

"We have been warned against a separate officer organization movement by the IAFF (which is another proof that it is a nationally organized union breaking move—and let's call it what it is) and have been told to fight it because it brings no good to the fire fighter. It does end up doing, among other things, the following:

"1. The officers lose because they are no longer members of a union and become a minority group. They become subject to management with no recourse of action and lose many Union gained benefits, viz.: bid rights.

"2. The privates lose because they must now fight the number of officer positions as being too high and thus diminish their chance for advancement.

"3. Both officers and privates lose because a divided department causes morale problems.

"4. EVERYONE LOSES BECAUSE A DIVIDED DEPARTMENT IS NOT AND CANNOT BE AS STRONG AND EFFECTIVE AT CITY HALL OR THE STATE CAPITOL WHEN ONE GROUP CAN BE PLAYED AGAINST THE OTHER. SO, IN THE END, LITTLE IS GAINED FOR THE FIRE FIGHTER.

"If there is still any doubt of why and what will happen, who is behind a separate officers organization and its results, then let's get together and get all of the points out in the open.

"I pleaded for unity in our Union in my Fire Flyer letter of September, I do so again at this time."

Believing that their loyalty to their men was being questioned and that they were being accused of being scabs, officers of the department took umbrage at the letters and the editorial, and they asked Walker to discipline Fisher. The chief asked Fisher to meet with him and representatives of the Officer's Association to smooth things over and to apologize. This Fisher refused to do. Thereafter, on January 23, 1970, Walker suspended Fisher for five days without pay, and in his notification of the suspension, Walker said:

"This action is initiated as a result of your impugning the character of the organizers and officers of the Salt Lake City Fire Officer's Association in your article that appeared in the September 1969 issue of the 'Fire Flyer' and by your unwillingness to meet with me and the officers of this Association in an effort to resolve this problem."

The suspension was purportedly under a civil service rule which said that action could be taken for violation of a departmental rule, and Rule 51 of the Fire Department said:

"Members shall not wantonly or maliciously make any false report concern-

ing any member or business of the department. Members are solicited to offer constructive suggestions by way of written reports. Any criticism to be offered of other members or of matters pertaining to the department shall be reported to the Chief. Members shall not engage in altercations. Violation of this rule may be considered grounds for suspension or dismissal."

Two months after the suspension, this suit was filed, and in it Fisher asks injunctive relief, $164.80 damages for his lost pay during the 5-day suspension plus damages for mental suffering and punitive damages. Trial was to the court, and the trial judge made and later signed the transcript of his oral findings of fact which under Pickering v. Board of Education (1968) 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, are all important in the resolution of the First Amendment question here involved. The most important of the trial judge's findings [and all findings based on testimony in the case are fully supported by the record] are these:

1. "At the time of said publication, for various reasons involving primarily the question of pay and representation, relations within the fire department were sensitive and somewhat volatile."

2. The letter must be read to be (and the officers read it as) "a charge that if not all, at least a substantial part of the officers concerned with the organization, which the evidence indicates included a majority of the officers of the department, many of whom were also members of the union, were unfaithful firefighters who improperly connived with the city officials against the interest of lower rated men and in dishonorable opposition to them, and yet were so callous as to have no moral regrets for their infidelity, even boasting about it, that their dishonorable ways should be condemned by every firefighter, that the action taken by the officers identified by the union had damaged every man on the job through a few selfish officers wanting everything for themselves."

3. "These statements were not justified by the facts, bordered on the libelous, were highly detrimental to the relationship between officers and firefighters, and were disruptive in fact of the good order and discipline of the department."

4. "There was reasonable ground for the belief and conviction of defendant that such charges were disruptive and divisive and unless corrected would be to the grave detriment of his command."

5. The chief attempted to effect a meeting between plaintiff and the Officer's Association to ameliorate the effect of the disruptive letter, but, although plaintiff would meet with the chief, he refused to meet with representatives of the Officers' Association.

6. The chief was faced "with not only the deterioration of the relationship between officers and men . . . but the deterioration of his own position."

7. Fisher's second published letter was "a reaffirmation, in effect, of the charges made . . . this letter standing alone is perfectly all right, but by its reiteration it certainly doesn't correct the situation; and simply as to the officers covered, which in the original publication covered the majority of the officers who did participate in the organization, I can't see that it does anything but exacerbate the situation."

8. The five day suspension was within the chief's authority, and, although Rule 51 was violated, even without such a rule, "one cannot use that sort of language and divisively set officers against men,

with no just reason . . . and not run the reasonable risk of moderate suspension."

In Pickering v. Board of Education, supra, plaintiff, a teacher, wrote a letter to the editor of the local newspaper critical of the school board's fiscal policies concerning expenditures for athletics as compared with spending for academic purposes. In an appendix to its opinion, the Court compared the letter with the record and found that some of plaintiff's statements were correct and some were incorrect. The Court held that "in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." In reversing the decision of the Supreme Court of Illinois, the Court emphasized:

"To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court. E. g., Wieman v. Updegraff, 344 U.S. 183, [73 S.Ct. 215, 97 L.Ed. 216] (1952); Shelton v. Tucker, 364 U.S. 479, [81 S.Ct. 247, 5 L.Ed.2d 231] (1960); Keyishian v. Board of Regents, 385 U.S. 589, [87 S.Ct. 675, 17 L.Ed.2d 629] (1967). '[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' Keyishian v. Board of Regents, supra, at 605–606, [87 S.Ct. at 685]."

However, the Court refused to equate restrictions on a right to dismiss a public employee to the immunity granted an ordinary citizen from responding in damages for a false but non-malicious statement concerning a public official or public figure. See, New York Times v. Sullivan (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686; St. Amant v. Thompson (1968) 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262; Time, Inc. v. Hill (1967) 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456.

Justice Marshall noted that in dealing with a dismissal of a public employee, the problem "is to arrive at a balance between the interests of the (public employee), as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." In Pickering, the teacher's criticism was of a widely publicized and openly debated school board policy concerning expenditure of public funds, and the Court noted that Pickering's statements were not directed towards anyone with whom he normally would be in contact during the course of his work. Here, of course, Fisher's criticisms were aimed squarely at his immediate supervisors and at the immediate supervisors of most union members, and, as has been noted, the trial judge found that the situation was volatile; that the statements were false; that defendant believed that the statements were and they were in fact divisive, disruptive and detrimental to the department's discipline. Thus, we do not have a *Pickering* situation; rather, we have the case described in footnote 3 of the *Pickering* opinion:

"Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such cases."

Understandably, the *Pickering* Court said, "Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed to furnish grounds for dismissal we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged."

The trial judge here found the important and controlling facts not present in *Pickering* are present here. The chief and officers of the Salt Lake City Fire Department testified to the disruptive impact of the letters on the morale of and relationships within the department. Their testimony was contradicted by other witnesses, but the trial judge saw and observed the witnesses, and his findings of fact will not be disturbed if supported by the record. That being true, all that remains is to determine if, based on his fact findings, the trial court was correct in concluding that the balance mentioned in *Pickering* weighs in favor of upholding Fisher's suspension or whether Fisher's First Amendment rights weight the scale against the chief's good faith order for a five day suspension of appellant.

In Murphy v. Facendia (1969) (D.C. Colo.) 307 F.Supp. 353, no one had been fired or suspended, but plaintiffs, who were members of VISTA, were told that if they signed a "Declaration of Conscience" opposing the Viet Nam war they would be discharged from their employment. They signed the statement and brought suit seeking declaratory and injunctive relief. The court held that it had jurisdiction, but it denied relief, and one of the reasons assigned for dismissing the action was:

> "Moreover, the statement in question caused a conflict between plaintiffs and their immediate superiors, and the evoking of such conflict is one of the criteria established in *Pickering* as a cause for limiting statements of public employees."

Meehan v. Macy (1968) 129 U.S.App. D.C. 217, 392 F.2d 822 is apposite. Meehan was a policeman in the Canal Zone and he was also president of the police union. During 1964, there were serious civil disorders in the Canal Zone, and in an effort to lessen the tension, it was decided to hire some Panamanians on the police force. The union wanted no Panamanians on the force, and a meeting of union representatives, including Meehan, and officials of the Canal Zone was called. At that meeting the union representatives were cautioned to limit their objections to official channels. Meehan thereafter participated in an interview by the press, and he caused a biting poem and a letter to be distributed. He was discharged from the police force for, (1) conduct unbecoming a police officer of the Canal Zone government; (2) failing to obey instructions prohibiting discussion of the personnel plans for the police force and (3) failing to obtain clearance from the Governor for the release of articles pertaining to government activities in the Canal Zone. The Court held that the second and third charges were not proven in the record, but it found that the first charge was supported by the record, and the court remanded the case for further consideration by the Civil Service Commission for a determination as to whether guilt of the single charge warranted discharge or some lesser punishment. Judge Leventhal commented that, "With mounting provision of increased and increasingly indispensable services rendered by Government employees, the public weal demands administration that is effective and disciplined, and not beset by turmoil and anarchy." He noted that although public employees certainly do not forfeit all First Amendment rights because of their public employment, they have lesser First Amendment rights when their statements and activities "are reasonably deemed inconsistent with their public status and duties." *Meehan* also mentions the fact that a union president was involved, and it was said, "It (the union presidency) also gave him a stature and

commensurate responsibility, both to the union and to the employer, to confine himself to channels and to exercise temperance." Finally, the court held:

"We think it is inherent in the employment relationship as a matter of common sense if not common law that an employee in appellant's circumstances cannot reasonably assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory lampoons. We believe that Meehan cannot fairly claim that discharge following an attack like that presented by this record comes as an unfair surprise or is so unexpected and uncertain as to chill his freedom to engage in appropriate speech."

*Meehan* was decided before *Pickering*, and an en banc rehearing of the case was granted by the District of Columbia Circuit Court of Appeals. In Meehan v. Macy (1969), 138 U.S.App.D.C. 41, 425 F.2d 472, the court said that since additional evidence might be taken on remand, it would not decide whether *Pickering* had any impact on the case under the record then before the court, and the full court ordered that "The Commission may consider this an appropriate time to reconsider its precedents in view of *Pickering* and to establish general guidelines insofar as that may be feasible."

The en banc remand of *Meehan* does not seem to us to imply any retreat from the court's position in the full departmental opinion; rather it seems to be a remand to permit the taking of evidence to see if the facts inquired by *Pickering* could be proven. Nor do we think that Muller v. Conlisk (1970) 7 Cir., 429 F.2d 901 helps appellant. That case held no more than that the police department rule there in question was overbroad, and indeed it was, because it prohibited "Engaging in any activity, conversation, deliberation, or discussion which is derogatory to the Department or any member or policy of the Department."

Where, as here, the published criticism is false, where it is criticism of an immediate superior; where it has a divisive effect aligning the firemen against their immediately superior officers; where it is disruptive and injurious to the morale of the department; where the author of the letter refuses to try to ameliorate the situation; where the matter discussed is of departmental rather than of general public interest and where in the exercise of restraint the chief suspended the writer for five days instead of discharging him, we think that the balance mentioned in *Pickering* permits the suspension, and we affirm.

WILLIAM E. DOYLE, Circuit Judge (dissenting).

I.

### PRELIMINARY COMMENTS ON THE TRIAL COURT'S FINDINGS AND THE MAJORITY OPINION

I respectfully dissent. In doing so I do not question the findings of the trial court. I do not, however, agree with the weight that has been given to some of the evidence, including the finding that the letter was disruptive and divisive. Undoubtedly the letter had some effect on the relationships between officers and men, particularly the officers who were the leaders in the forming of the officers' union. We are aware that this is always a delicate relationship and that it first became imbalanced when the officers formed the separate union which necessarily was close to the administration and thus tended to isolate the organization of firefighters—the troops. The writing of the letter in question was retaliatory and it necessarily had some disruptive effect in the organization as a whole, but this is not the test. Here there are competing interests. Appellant was advancing the interest of his group, and his opposition to the formation of an organization which would weaken and undermine the organization of which he was president was entirely valid; thus the only valid complaint which could be made was regarding the means used in

exercising the undoubted right of appellant to speak up. In this connection one other preliminary matter should be mentioned: that the trial court found that the words used, though sarcastic and in bad taste, were not to be accepted in any literal sense and that at most they impugned disloyalty on the part of the officers who had organized the officers' union to the members of the firefighters, their men. When viewed in this light, the entire controversy emerges as a lot of todo about nothing, and it seems clear that the imposition of the sanction was not justified. Now, though, the case takes on a much more substantial posture in that appellant here contends for the support of an underlying principle: the independence of his institution and the preservation of the right of its spokesman to speak in its behalf.

Neither the administration, the trial court, nor the majority of judges here gives sufficient weight to the constitutional right of the appellant to speak in the course of advancing the interest which he represented. True, both the trial court and the majority mention the First Amendment, but give it little or no weight. Furthermore, the majority opinion declares that the Supreme Court in Pickering v. Board of Education of Twp. High School Dist. 205, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), refused to equate the test enunciated in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 262 (1964) to the present situation; New York Times v. Sullivan held in essence that a public official could not recover in defamation for statements directed at him except when the statements were shown to have been made with knowledge of their falsity or with reckless disregard of whether false or not.

Our reading of the opinion of the Supreme Court in Pickering v. Board of Education, *supra,* differs from that of the majority. The Court there says that criminal sanctions and damage awards are somewhat different in this context and remarks made by subordinates to superiors are not to be equated with suits for libel in any across-the-board manner. The Court went on to say that where the employment is insubstantially involved in the public communication the speaker enjoys the status of a member of the general public. Continuing, the Court went on to include the New York Times standards when it said:

> In sum, we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment. * * 391 U.S. at 574, 88 S.Ct. at 1738.

In our case there is also an insulating factor and that is that appellant was wearing, so to speak, the union president hat when he wrote the editorial. He did not purport, in other words, to speak as a fireman and was not criticizing either Fire Chief Walker or any of the officers in the area of their firefighting abilities. Still another insulating factor is that he was speaking to a limited group through the mimeographed newsletter which was used for this purpose. The statement made was not for the eyes of the general public, and this kind of publication is universally recognized as conditionally privileged. The rationale is that the author is speaking on behalf of and is engaged in advancing the group interest.[1]

---

1. See for example the decision of the Colorado Supreme Court in Bereman v. Power Publishing Co., 93 Colo. 581, 27 P.2d 749 (1933), having to do with statements made in a union newspaper. The court said:

   > Some of the words in the article in question are in bad taste, no doubt. Less offensive words might have been selected. But we must not overlook the fact that disloyalty to a union is fraught with such possibilities of disaster to the union cause that loyal union members may be excused for referring to it in strong terms of condemnation. The conduct of the plaintiff not unnaturally suggested to the minds of union members such words as "traitor," "spies," and "despicable." 27 P.2d at 752.

## II.

### THE STANDARD OF EVALUATION IN THE FREEDOM OF SPEECH CASES

Unquestionably Fisher was suspended and thus fined for speaking out, and without doubt the district court believed that the maintenance of order and good discipline in the fire department fully justified the action which was taken. However, such a standard is no longer approved by the Supreme Court. This involves the idea enunciated by Justice Holmes while on the Supreme Judicial Court of Massachusetts. He said that one may have a constitutional right to expression, but that he does not have a constitutional right to be a policeman. See McAuliffe v. City of New Bedford, 155 Mass. 216, 220, 29 N.E. 517, 519 (1892).

The extent of the development of the law governing the rights of public employees to speak freely is summarized in several articles.[2]

The upshot of the numerous decisions through the years is that a public employee enjoys the rights of freedom of expression conferred by the First Amendment and he is entitled to his protection.[3]

*Pickering* is, of course, the most significant of the cases cited. There a school teacher wrote to the local newspaper following a bond election and in his letter was highly critical of the school government. He was dismissed from employment on grounds similar to those adopted here. It was held that his letter "unjustifiably impugned the 'motives, honesty, integrity, truthfulness, responsibility and competence' of both the Board and the school administration" and it "would be disruptive of faculty discipline, and would tend to foment 'controversy, conflict and dissension' among teachers, administrators, the Board of Education, and the residents of the district." (88 S.Ct. at 1734). The Illinois Supreme Court affirmed the board, but the United States Supreme Court reversed.

It was conceded in the Court's opinion that the Pickering letter was sarcastic and made very serious charges, including one that the board had built an athletic field out of bond funds, even though this item was not included in the board authorization. He charged the school board with creating a "totalitarian atmosphere" and of lying to the public in an effort to persuade them to support high school athletics.

We note that arguably the privileged nature of this statement calls at least for consideration in the balancing of conflicting interests of the New York Times requirement that the statement, if false, be either knowingly made or made with a wanton disregard for the rights of others, neither of which was found to exist in the present case.

2. See Note, "The First Amendment and Public Employees: *Times* Marches On; 57 Georgetown Law Journal 134 (1968), Note, "The First Amendment and Public Employees—An Emerging Constitutional Right to be a Policeman?", 37 George Washington Law Review 409; and Developments in the Law, Academic Freedom, 81 Harv.Law Review 1045 (1968).

3. See, e. g., Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1958); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Pickering v. Board of Education of Twp. High School Dist. 205, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

The words of the Supreme Court in Garrity were:

We conclude that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights.

There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price. * * * Assertion of a First Amendment right is [one].

87 S.Ct. at 620.

The Supreme Court acknowledged that some of the statements were erroneous, but concluded that they had no tendency to impede the classroom performance of the teacher and refused to give effect to the contentions of the board that Pickering's letter caused considerable discontent and disruption in the academic community as well as the community at large.

The width, breadth and impact of the rights guaranteed by the First Amendment are lined out by Mr. Justice Brennan in New York Times, *supra,* and are worth repeating here:

The First Amendment, said Judge Learned Hand, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." United States v. Associated Press, 52 F.Supp. 362, 372 (D.C.S.D.N.Y.1943). Mr. Justice Brandeis, in his concurring opinion in Whitney v. California, 274 U.S. 357, 375–376, 47 S.Ct. 641, 648, 71 L.Ed. 1095, gave the principle its classic formulation:

"Those who won our independence believed * * * that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. *But they knew that order cannot be secured merely through fear of punishment for its infraction;* that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument

of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed."

Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.

\* \* \* \* \* \*

*The constitutional protection does not turn upon "the truth, popularity, or social utility of the ideas and beliefs which are offered."* N.A.A.C.P. v. Button, 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405. (Emphasis supplied).

376 U.S. at 270–271, 84 S.Ct. at 720–721.

We gather further from the cases that the fact that appellant was a fireman and a union president in no way diminishes his constitutional right: It was pointed out in Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940):

The dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. * * * Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society.

See also Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945), reh. den. 323 U.S. 819, 65 S.Ct. 557, 89 L.Ed. 630, wherein it was said:

The right . . . to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as

part of free speech, but as part of free assembly. 65 S.Ct. at 324.

This court has also had occasion to recognize that there is a constitutional right to disseminate facts concerning a labor dispute. See Slater v. Denver Building & Construction Trades Council, et al., 175 F.2d 608 (10th Cir. 1949), and Taxi-Cab Drivers Local Union No. 889 v. Yellow Cab Operating Co., 123 F.2d 262 (10th Cir. 1941). See also N.L.R.B. v. Ford Motor Co., 114 F.2d 905 (6th Cir. 1940), wherein it was said:

> The right of employees to organize for collective bargaining, to select representatives of their own choosing, and to unite for concerted action in other respects, is now so clearly recognized as a fundamental right that citation is superfluous. The right to hold views upon any and all controversial questions, to express such views, and to disseminate them to persons who may be interested, has even more venerable sanction. 114 F.2d at 913.

In recognizing this right, the courts have unhesitatingly enjoined public employers from discharging or otherwise seeking to muzzle employees in their union activities. See, e. g., American Federation of State, County, and Municipal Employees, AFL–CIO v. Woodward, 406 F.2d 137 (8th Cir. 1969) ; McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968). In *McLaughlin,* the court pointed out that

> [i]f teachers can engage in scathing and partially inaccurate public criticism of their school board, surely they can form and take part in associations to further what they consider to be their well-being.

398 F.2d at 289.

It seems clear then that the union aspect and the public employee aspect do not serve to diminish the scope and extent of the right of free expression.

The question remains whether the guarantee is an absolute one, and we do not hold that it is. Nevertheless, the Supreme Court and the courts of appeal have recognized that freedom of expression under the First Amendment is a preferred right. See Thomas v. Collins, *supra,* wherein it was stated that First Amendment rights have a preferred place in our scheme, and further stated that the priority enjoyed by the First Amendment rights gives to these liberties a sanctity which does not permit dubious intrusions. See 65 S.Ct. at 322. The extent to which the right is preferred is recognized by the Court's forbidding actions which are said to have a chilling effect upon the exercise of free expression. See Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), and N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), wherein the Supreme Court said:

> Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.
> 83 S.Ct. at 338.

It is to be concluded from a reading of the cases then that the only limitations on one's First Amendment rights which can be validly imposed by the state arise when the state is acting so as to deal narrowly and specifically with a problem which actually and presently threatens to interfere with a truly compelling state interest.[4]

Considering the words used here, it cannot be said that there was a violation

---

4. See, e. g., Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) ("in the absence of a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction [of breach of the peace.]" (60 S.Ct. at 906) ; Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1968) ; Whitney v. California, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) ; *see also* Gregory v. Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969).

of a statute enacted for the purpose of insulating and protecting any such compelling state interest.

## III.

### CONCLUSORY COMMENTS AND EVALUATIONS

As noted at the outset, we do not take issue either with the evidence which the trial court selected in making his findings or with the findings which were formulated. The weight given to the facts in arriving at the conclusions, and especially the conclusion that the interest of the city in maintaining discipline outweighs the First Amendment considerations in the balance, we must disagree with because it is contrary to the law. From *Cantwell, supra,* to *Pickering* and beyond, the Supreme Court has steadfastly upheld the freedom of the individual to express himself even in the face of relatively strong countervailing interests of the community in maintaining discipline. We are not saying that the interest of Salt Lake in the present instance is not a valuable interest. We are merely saying that when it is weighed against the interest which appellant here advances—that of preservation of the First Amendment freedoms—it is no contest.

The primary contention of appellee here is not that the appellant spoke on the subject but that he spoke immoderately and thus offended some of the officers and disturbed the peace, so to speak. It is highly noteworthy, however, that the morale was not good prior to the publishing of the Fisher letter in the Fire Flyer. See testimony of Capt. Marvin C. Kimball who said that the low morale and lack of respect were not caused by the letter, although other evidence was to the contrary. It is inferable from the testimony as a whole that the letter offended some of the officers and caused them to be somewhat uneasy about their relationships with the men.

As to its effect on the response of the men in fighting fires or carrying out their duties as such, there is a dearth of evidence that the letter produced any remarkable effect. Appellant's immediate superior testified that the letter did not affect efficiency in general and that appellant's efficiency was not affected. We come back to the fact that the efforts of appellant did not pertain to fire fighting, but were concerned with maintaining the independence and integrity of the union as an institution. The letter's concern was not with function so much as with economic objectives.

If there were to exist a clear and present danger of actual disruption state action which would prohibit the expression in favor of discipline would be jusified, but until that point is reached the right to speak continues inviolate. This was well expressed by the Supreme Court in Tinker v. Des Moines Independent Community School District, *supra,* wherein it was said that undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression. The statement of the Supreme Court reads in part:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. * * * But our Constitution says we must take this risk . . . .

89 S.Ct. at 737.

The Court went on to say, in words particularly applicable here:

> In order for the State . . . to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.

*Id.* at 738.

Both the *Pickering* and *Tinker* formulations have been widely applied: See, e. g., Brukiewa v. Police Commissioner of Baltimore, 257 Md. 36, 263 A.2d 210, holding that in order to suppress the

state must show that the utterer is made unfit for public service or that the words adversely affect public service to a degree that justifies restriction; Scoville v. Board of Education of Joliet, 425 F.2d 10 (7th Cir. 1970) which goes far beyond the present facts as does Muller v. Conlisk, 429 F.2d 901 (7th Cir. 1970), involving criticisms of his department by a Chicago policeman. He was merely reprimanded. In reversing dismissal of his civil rights action the court noted:

> A major portion of defendants' brief is devoted to distinguishing Pickering by pointing out that policemen are different than teachers and that police departments are quasi-military forces dependent upon rigid internal discipline for their effectiveness. We cannot agree that such considerations make *Pickering* inapplicable.

429 F.2d at 904.[5]

One final comment: Chief Walker objected to the wording chosen by Fisher to make his point, feeling that the letter as phrased was not "Christian" and admitting that had it been more temperately put there would likely have been no disciplinary action taken; the trial court characterized the letter as bordering upon the libellous.[6] This contention has been frequently encountered by the courts, and the possibilities for action have been held limited in a narrow manner to the "fighting words" rationale of Chaplinsky v. New Hampshire, 315 U.S.

568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). See, e. g., the venerable and wise decision of the Court in Cantwell v. Connecticut, supra; Scoville v. Board of Education, supra; New York Times Co. v. Sullivan, supra; Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947), and Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Though we may sometimes devoutly desire moderation in expression, we do not always get it. Despite the offensiveness of the words, the right to speak them is upheld as against action which would chill free expression and which does not come up to the standard of immediate danger of causing disruption.

It is unnecessary to rule on the specific regulations which gave rise to the sanction. Rule 51 is not invalid on its face. It is enough then to say that Fisher's suspension was the result of the unconstitutional application of the rule. The department does not contend the rule would always be applied so as to achieve the result which we have before us, and we assume that it would not be so applied.

Nor is injunctive relief proper here. I would merely hold that appellant is entitled to damages in the amount of wages lost as a result of the suspension and, of course, he is entitled to be upheld in his effort to assert his First Amendment rights. In my humble judgment, the cause should be reversed.

---

5. See also Pickings v. Bruce, 430 F.2d 595 (8th Cir. 1970); Hatter v. Los Angeles City High School District, 452 F.2d 673 (9th Cir. 1971); Battle v. Mulholland, 439 F.2d 321 (5th Cir. 1971); Fluker v. Alabama State Board of Education, 441 F.2d 201 (5th Cir. 1971); Donovan v. Reinbold, 433 F.2d 738 (9th Cir. 1970); Crews v. Cloncs, 432 F.2d 1259 (7th Cir. 1970).

6. In this connection, we only note in passing that Fisher was in effect commenting upon a subject of mutual interest to a limited audience, and hence was within a clearly recognized privilege with regard to the making of defamatory statements, entirely aside from constitutional considerations, as expressed by the Colorado Supreme Court in Bereman v. Power Publishing Co., 93 Colo. 581, 27 P.2d 749 (1933), cited supra. See also Manbeck v. Ostrowski, 384 F.2d 970 (D.C. Cir. 1967) and Willenbucher v. McCormick, 229 F.Supp. 659 (D.Colo.1964)